890 F.2d 202
 1990 A.M.C. 765
 In the Matter of the Complaint of Glenn R. HECHINGER, as
Charterer and Owner Pro Hac Vice of the TRAWLER
WYNN D II for Exoneration from or
Limitation of Liability,
Glenn R. HECHINGER, Plaintiff-Appellee,
v.
Stewart CASKIE, Defendant-Appellant.
 No. 88-2525.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 13, 1989.
Decided Nov. 27, 1989.
 
 Lyle C. Cavin, Jr., San Francisco, Cal., for defendant-appellant.
 Terence S. Cox, Derby, Cook, Quinby & Tweedt, San Francisco, Cal., for plaintiff-appellee.
 Appeal from the United States District Court for the Northern District of California.
 Before NORRIS, BEEZER and BRUNETTI, Circuit Judges.
 BRUNETTI, Circuit Judge:
 
 I.
 OVERVIEW
 
 1
 Appellant, Stewart Caskie, appeals the district court's ruling in favor of appellee, Glenn R. Hechinger. Appellee, owner pro hac vice of the vessel WYNN D II, petitioned for exoneration from or limitation of liability under the Limitation of Liability Act (46 U.S.C.App. Sec. 183) for injuries caused when high breaking waves suddenly surrounded his vessel, and ultimately caused it to sink. Appellant suffered back injuries when the force of the sea threw him to the floor of the wheelhouse and he sought compensation under the Jones Act (46 U.S.C.App. Sec. 688) for negligence and under general maritime law for unseaworthiness. The district court found for Hechinger and we affirm, holding that the proximate cause of the injuries was an Act of God or peril of the sea.STATEMENT OF FACTS
 
 
 2
 The district court made findings of fact in its Memorandum of March 16, 1988. These findings of fact shall not be set aside unless clearly erroneous, and we give due regard to the district court's opportunity to judge the credibility of the witnesses. Fed.R.Civ.P. 52(a); Wood v. Sunn, 852 F.2d 1205, 1208 (9th Cir.1988); see also Brophy v. Lavigne, 801 F.2d 521, 524 (1st Cir.1986) (Where credibility determinations are clearly explained, and the factual decisions are supported by the record, court of appeals must uphold trial court's judgment). The following is a summary of the district court's 58 factual findings.
 
 
 3
 The WYNN D II, a forty-nine foot trawler, was donated to the Boy Scouts of America in September 1985. In August, Robert Shadbolt & Associates surveyed the WYNN D II out of the water, finding the vessel to be fit and seaworthy, pending minor repairs which were made.
 
 
 4
 Hechinger, looking to buy a large wooden motor boat, contacted Ken Underwood, a yacht broker for the past twenty-eight years and principal of Edgewater Yachts Brokerage in Sausalito, California. They had a common interest in classic wooden boats and had known each other for some time. The Boy Scouts, past clients of Underwood, told him that the WYNN D II was for sale and provided Underwood with photos of the boat and the August, 1985 survey. Hechinger went to Newport Beach and spent two to three hours inspecting the vessel; then he took the vessel on a sea trial lasting over two hours. However, only one half hour was spent on ocean waters. The vessel handled well with no problems.
 
 
 5
 Hechinger agreed to lease the vessel for two years, with an option to buy, and the parties have stipulated that Hechinger is the "owner" of the vessel. As Hechinger was inexperienced at ocean-going travel, Underwood arranged to have the vessel delivered to Hechinger in Alameda. Underwood, a yacht broker for the past twenty-eight years, has often arranged for delivery of vessels.
 
 
 6
 Underwood contacted Stevenson, an experienced skipper of twenty years, who over the past twelve years has delivered at least fifty-eight vessels of varying sizes up the California coast. Underwood knew Stevenson personally and Stevenson had never suffered a casualty before the WYNN D II. Stevenson and Hechinger agreed that Stevenson would make all arrangements to bring the vessel up the coast, including hiring the crew, preparing the vessel for departure, deciding when to leave for Newport Beach and when to arrive in Alameda. Underwood arranged for the Boy Scouts to have the oil and fuel filters changed and the fuel tanks filled. Stevenson had asked Hechinger to advance $300 of the expense money. Hechinger mailed a check to Underwood's office, but the check did not arrive in time, so Stevenson used his own money to pay for part of the airfare of the crew, the food and supplies for the voyage, taking $60 with him. The total cost of the delivery was $500 plus expenses. After these initial arrangements were made, Hechinger had no further contact with the vessel or the crew until he learned of the abandonment outside San Francisco Bay. Stevenson learned that Underwood had arranged for the GIRLFRIEND III, a sixty foot antique motor cruiser built in 1929, to be delivered at the same time. Bruce Martens, the skipper of the GIRLFRIEND III, and Stevenson arranged to travel up the coast together. Martens has lived on boats in the Bay Area his entire life and made over two hundred coastal voyages between Seattle and San Diego.
 
 
 7
 Stevenson and the crew left for Newport Beach on November 29, 1985, a Friday, and spent the rest of the day preparing for the trip. Stevenson and Caskie inspected the structural elements of the vessel, its hoses, delivery systems, navigational lights, and radio. A Boy Scout representative told Stevenson that the filters had been changed and the fuel tanks "topped off." The engine was warm and fuel could be seen near the tanks where some had spilled. The sight gauges signaled full. Stevenson was pleased that Hechinger left him to inspect the vessel himself as it was part of his normal routine. Stevenson found the vessel to be structurally fit and safe for the trip north. The crew purchased a new bilge pump after the Boy Scouts gave their permission to use their account at the marina to purchase anything they needed. They spent that night on the WYNN D II.
 
 
 8
 Stevenson considered the first hour or two of the voyage to be the sea trial and if the vessel performed poorly, he would return to port. The WYNN D II had a 2300 RPM capacity with ideal cruising at 1800 RPM. However, at 1800 RPM, the vessel had a slight vibration problem, which disappeared at 1500 RPM, or at eight to ten knots. The vessel lost one-half knot of speed due to the vibration problem. Stevenson still thought the vessel safe and capable of the trip to San Francisco.
 
 
 9
 The WYNN D II and GIRLFRIEND III met outside the Los Angeles Harbor. After this, the crew noticed an oil gauge read "zero" but decided, after a visual inspection, that since the engine did not overheat, the gauge was faulty. Shortly after, the generator ceased working, shutting down the vessel's power source, including the refrigerator and stove. At about the same time, the crew noticed the gas gauges were "tucked in an awkward position," which did not allow them an accurate reading. A true reading revealed the port tank was empty and the starboard tank was only one quarter full. To be safe, the crews transferred excess fuel from the GIRLFRIEND III to the WYNN D II, using the old bilge pump, transferring 50 to 60 gallons until the pump gave out. Stevenson estimated this would be enough to get them to San Francisco.
 
 
 10
 The National Weather Service forecast gale warnings, and although the vessels encountered large rolling swells, for these large vessels the sea was comfortable up to Monterey. From Monterey on, the ocean tends to be rougher, and the skippers had to decide whether to wait for a better forecast. The vessels spent Sunday night in Monterey, and Monday morning, in spite of the continuing forecast for storms, the skippers decided to continue as they could seek refuge at Moss Landing, Santa Cruz, or Half Moon Bay, as well as return to Monterey. They in fact had a smooth ride all the way to the South Channel to San Francisco Bay, except for some engine trouble by GIRLFRIEND III which delayed them an hour. The National Weather Service issued a small craft warning and then an advisory at 2 p.m. from Redwood City that afternoon, but both vessels were well over the thirty-five feet maximum of small crafts.
 
 
 11
 The GIRLFRIEND III was one to two hundred yards ahead of the WYNN D II as the vessels approached the South Channel entrance to the San Francisco Bay. Martens, skipper of the GIRLFRIEND III, radioed the WYNN D II, informing them he was taking the South Channel. Stevenson said he had no objection, nor was there any objection or discussion of the decision with the crew. Pleasure yachts and small vessels used the South Channel almost exclusively, as it is only four miles long, the shortest route from the south into San Francisco Bay. The other route from the south, the Main Channel, is used by the huge shipping vessels and the coast guard publication, the Coast Pilot advises smaller vessels to take the South Channel to avoid the large ship traffic. The Pilot states that the North Channel, an alternate route, also used by smaller vessels, can be dangerous in heavy seas and large swells. Stevenson has taken the South Channel fifty-seven out of fifty-eight times he has delivered vessels from Southern California and had never encountered any problems, although he is aware that it could contain breaking waves in stormy conditions. Martens was also very familiar with the South Channel and conditions in the Bay.
 
 
 12
 As they both approached the South Channel, visibility was four miles, with light winds and moderate seas with large rolling swells spaced far apart, similar to conditions they encountered all along the coast. Martens, still about one to two hundred yards ahead, saw no breaking waves in the Channel and in fact could see the Marin Headlands and cars on the road in the distance. He radioed WYNN D II and told them he was going into the South Channel. Stevenson, who noted the good visibility and lack of breaking waves, voiced no objection and the crew neither voiced objection nor mentioned a concern about low fuel. As the GIRLFRIEND III was halfway through the Channel, a huge breaking wave appeared, then a second and a third. Although it is not unusual to see breaking waves in the South Channel in heavy seas and storm conditions, these were larger than any Martens had seen. The Coast Guard advised him to turn his bow to the west to reach deeper water beyond the waves. Martens did and so advised Stevenson. The WYNN D II soon found itself surrounded by twenty to twenty-five foot waves, dropping from the crest of one wave into the trough of another as Stevenson turned the vessel west to deeper water. The entire crew was in the wheelhouse, which had no handholds anywhere. Most vessels of WYNN D II's size and the overwhelming majority of vessels manufactured today do not contain handholds in the wheelhouse as standard equipment. Appellant Caskie braced himself by placing one hand on a table and the other against the dashboard, but the third roller coaster wave threw him to the floor of the wheelhouse, where he landed on his buttocks injuring his back.
 
 
 13
 The power of the waves tore a hole in the bow of the WYNN D II and completely ripped the wheelhouse off the GIRLFRIEND III. Stevenson realized they were taking on too much water and that they had to abandon the vessel. Both skippers radioed the Coast Guard which sent out a forty foot rescue vessel. Unfortunately, the Coast Guard vessel was hit by a wave, rolled 360 degrees, and could not complete the rescue. The Coast Guard had to send a helicopter to airlift the crews off the vessels. Caskie was finally taken off the vessel about two and a half hours after the rescue call. The engine was still running at this time. One and a half hours later, the Coast Guard rescued the remaining crew members, four hours after the initial call. The vessel did not run out of fuel, if at all, until this final evacuation occurred.
 
 II.
 DISCUSSION
 A. Jurisdiction
 
 14
 The district court assumed jurisdiction of this case under the Limitation of Liability Act (the "Act"), 46 U.S.C.App. Secs. 181 et seq. (1989). Under the Act, a shipowner faced with liability arising out of a single voyage may petition the appropriate federal district court for exoneration from liability or limitation of liability to the value of the ship itself. The court, upon obtaining control of the ship or the value of the ship from the petitioner, may enjoin all claimants from maintaining separate suits and require them to file all of their claims in the limitation proceeding. The court then determines whether the shipowner is liable to any of the claimants and, if so, whether the shipowner's liability is limited under the Act to the value of the ship. Based on these determinations, the court may apportion the value of the ship among the claimants.
 
 
 15
 Appellant contends that the liability limitation provision of the Act, 46 U.S.C.App. Sec. 183(a), does not apply to private, non-commercial vessels ("pleasure boats") such as the one at issue here. We disagree.
 
 
 16
 The Sixth Circuit has held that the liability limitation provision of the Act does apply to pleasure boats. In re Young, 872 F.2d 176 (6th Cir.1989). Young reaffirmed the rule of the Sixth Circuit, based on the plain wording of Section 183(a), that the liability limitation applies to "any vessel," including pleasure boats. The Young court noted that all Supreme Court and circuit court decisions to date are consistent with this decision, id. at 177, and that holding otherwise would be an attempt to "judicially legislate." Id. at 178.
 
 
 17
 We find the reasoning in Young persuasive. Accordingly, we hold that the limitation provision applies to pleasure boats, and that the district court had jurisdiction to hear this case.B. Liability Under General Maritime Law Or The Jones Act
 
 
 18
 Once a proper limitation of liability petition has been filed, the court "must [first] determine what acts of negligence or conditions of unseaworthiness caused the accident." Petition of M/V Sunshine, II, 808 F.2d 762, 764 (11th Cir.1987) (quoting Farrell Lines, Inc. v. Jones, 530 F.2d 7, 10 (5th Cir.1976)). That is, a liability must be shown to exist. "The whole doctrine of limitations of liability presupposes that a liability exists which is to be limited. If no liability exists there is nothing to limit." Northern Fishing & Trading Co., Inc. v. Grabowski, 477 F.2d 1267, 1272 (9th Cir.1973).
 
 
 19
 The district court found that the proximate cause of Caskie's injury was an Act of the or peril of the sea and not unseaworthiness or negligence on the part of the owner. We affirm and find this dispositive of all other issues in the case.
 
 
 20
 Proximate cause is generally a mixed question of law and fact, Lies v. Farrell Lines, Inc., 641 F.2d 765, 770 (9th Cir.1981), but in this circuit it is a question for the fact finder, whose determination is binding on appeal unless clearly erroneous. In re White Cloud Charter Boat Co., Inc., 813 F.2d 1513, 1517 (9th Cir.1987); Armstrong v. United States, 756 F.2d 1407, 1409 (9th Cir.1985). There is a split in the circuits concerning the standard of review in an admiralty court's determination of negligence and apportionment of fault. See Waterman Steamship Corp. v. Gay Cottons, 414 F.2d 724, 735 n. 27 (9th Cir.1969) (and cases cited therein).
 
 
 21
 1. Unseaworthiness under general maritime law.
 
 
 22
 If the WYNN D II was unseaworthy at the time the injury occurred and the unseaworthiness was the cause of the injury, then the owner cannot claim limitation of liability under the Act. Sea Shipping Co. v. Sieracki, 328 U.S. 85, 93-94, 66 S.Ct. 872, 876-77, 90 L.Ed. 1099 (1946). If the unseaworthiness causes injury or death, the privity or knowledge of the master at or prior to the commencement of a voyage shall be deemed conclusively the privity and knowledge of the owner of such vessel. 46 U.S.C.App. Sec. 183(e); Waterman, 414 F.2d at 728 n. 10. "A boat owner's liability for unseaworthiness 'is a form of absolute duty owing to all within the humanitarian range of its humanitarian policy.' " Armour v. Gradler, 448 F.Supp. 741 (W.D.Pa.1978) (quoting Seas Shipping Co., 328 U.S. at 95, 66 S.Ct. at 877). In essence, the doctrine requires that the vessel, including the hull, the decks, or the machinery, be reasonably fit for the purpose for which they are used. Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963).
 
 
 23
 The person claiming liability under the doctrine must first show that he was "in the ship's service" and the warranty extends to him. Gebhard v. S.S. Hawaiian Legislator, 425 F.2d 1303, 1310 (9th Cir.1970). Here the district court found, and it is not disputed, that Caskie was a Jones Act seaman bringing him within the scope of the warranty of seaworthiness. See District Court's Conclusion of Law No. 2. Secondly, the claimant must show that the injury was caused by a piece of the ship's equipment or an appurtenant appliance. Gebhard at 1312. The third element is that the equipment used was not reasonably fit for its intended use. Id. The burden of proof to show unseaworthiness was on Caskie, the claimant. Northern Fishing & Trading Co., 477 F.2d at 1271-72. Caskie contends that the WYNN D II was unseaworthy in that 1) the vessel lacked handholds in the wheelhouse; 2) the vessel lacked adequate fuel or the means to obtain fuel to complete the voyage; 3) the skipper was incompetent; 4) the vessel had a vibration problem.
 
 
 24
 The district court found the vessel to be seaworthy. Conclusion of Law No. 12. Specifically, the district court found that the lack of handholds did not render the vessel unseaworthy, and that the vessel was "structurally fit and reasonably safe for the voyage." Id. Handholds are not standard equipment on presently manufactured vessels. Id. A ship only need be "reasonably suitable" to the purpose it was intended. Litherland v. Petrolane Offshore Const. Services, 546 F.2d 129, 133 (5th Cir.1977). "The warranty of the ship owner is not one of unconditional safety, but of fitness for duty of that which functions to provide the service tendered by the ship in the carriage of goods or people." Smith v. American Mail Line, Ltd., 525 F.2d 1148, 1150 (9th Cir.1975).
 
 
 25
 The district court also found that the WYNN D II had enough fuel for the voyage. This is not error as the court found that the engine in the ship was still running when Caskie was rescued and did not stop until at least four hours after their call to the Coast Guard. Factual Finding No. 54. Also, no concern over lack of fuel was voiced when the decision was made to enter the South Channel. Factual Findings Nos. 47, 48. Thus, there is no causation between the lack of fuel and the loss of the vessel or Caskie's fall. Legal Conclusion No. 12.
 
 
 26
 The district court found that the skipper and the crew were competent and did not render the vessel unseaworthy. Legal Conclusion No. 12. The skipper, Stevenson, had made 58 similar vessel deliveries and this was the first vessel he had lost. All the crew members all had ocean going experience. The tasks performed on the vessel, from Stevenson's inspection prior to departure, to the decision to go with the GIRLFRIEND III, to the transferring of fuel in Monterey, to the vessel's entrance into the Bay, were performed with reasonable competence. See Factual Findings Nos. 21, 27, 38, 46-50. Lastly, the vibration problem did not render the WYNN D II unseaworthy. The court found that the vessel lost only a half knot of speed by running at a low RPM. Factual Finding No. 33. The court found that the vessel ran smoothly at 1500 RPM and traveled at an "adequate pace of eight to ten knots." Conclusion of Law No. 12. Caskie cannot show that the vessel was unseaworthy. Hence Hechinger cannot be liable for "unseaworthiness."
 
 
 27
 2. Negligence under the Jones Act.
 
 
 28
 If the owner is not liable for "unseaworthiness," then Caskie must show negligence caused his injury, else there will be no owner liability to limit. See Northern Fishing & Trading Co., Inc., 477 F.2d at 1271-72. To recover under a Jones Act claim, "[t]he plaintiff has the burden of establishing by a preponderance of the evidence, negligence on the part of his employer or one for whom the employer is responsible." Litherland v. Petrolane Offshore Const. Services, 546 F.2d at 133. Then, the claimant must establish that the act of negligence was a cause, however, slight, of his injuries. Lies v. Farrell Lines, Inc., 641 F.2d 765, 771 (9th Cir.1981) (citing Rogers v. Missouri Pacific Railroad Co., 352 U.S. 500, 506-07, 77 S.Ct. 443, 448-49, 1 L.Ed.2d 493 (1957)) (discusses proximate cause required under FELA, and thus the Jones Act by reference); see 46 U.S.C.App. Sec. 688 (Jones Act expressly provides for seamen the cause of action and judicially developed doctrine of liability granted to railroad workers by FELA). While the district court's determination of the absence of negligence is subject to the clearly erroneous standard, In re White Cloud Charter Boat Co., Inc., 813 F.2d at 1517, whether a claim has been stated under the Jones Act is a question of law subject to de novo review. Dalla v. Atlas Maritime Co., 771 F.2d 1277, 1278 (9th Cir.1985) (and cases cited therein).
 
 
 29
 Caskie argues that owner-Hechinger was negligent in five ways: 1) negligent hiring of Stevenson; 2) neglecting to give Stevenson adequate expense money, including money for fuel; 3) setting time constraints that prevented proper inspection of the vessel and hurried their arrival to San Francisco; 4) relying on a three month old survey of the vessel; and 5) failing to instruct Stevenson to ascertain whether the vessel was seaworthy before departing. The district court found that Hechinger's reliance on Underwood to find him a skipper was prudent and reasonable. Conclusion of Law No. 13. Hechinger knew Underwood having dealt with him before and Underwood had been in the brokerage business for twenty-eight years which included numerous vessel deliveries. The court further found that even if Hechinger was negligent in failing to provide Stevenson with expense money, that any problem resulting in a fuel shortage was cured when the WYNN D II transferred fuel from the GIRLFRIEND III. Also, the decision to take the South Channel had nothing to do with any concern over fuel, so that negligence, if any, did not proximately cause the accident. Although Caskie claims there were time constraints, the evidence fails to show that Hechinger was concerned about time of arrival or that time constraints entered into any navigational decision. The trip was delayed a week so the two vessels could travel up the coast together. Stevenson took the time to inspect the vessel before they left. Even though Hechinger relied on a three month old survey, this reliance did not cause the accident as Stevenson inspected the vessel finding it structurally and operationally fit for the voyage. Likewise, Hechinger's failure to tell Stevenson to inspect the vessel did not cause any harm. The district court's findings are supported by the evidence and not clearly erroneous and its legal conclusions are reasonable under a de novo review.
 
 
 30
 Caskie also alleges that Stevenson was negligent in a variety of ways. However, Stevenson's failure to properly read the fuel gauges was "cured" in Monterey when the WYNN D II took fuel from the GIRLFRIEND III. Stevenson's decision to leave Monterey, in spite of predicted adverse weather conditions, was prudent in that the vessel could have sought refuge at Moss Landing, Santa Cruz or half Moon Bay or returned to Monterey. As it turns out, the weather conditions up to San Francisco Bay were calm and comfortable. The district court discussed Stevenson's decision to take the South Channel into San Francisco Bay at length. First, the South Channel was recommended by the Coast Pilot as large shipping vessels frequent the Main Channel and the North Channel is dangerous in stormy conditions. Second, the National Weather Forecast at 2:00 p.m. on the day of the accident predicted moderate seas with heavy swells and issued a small crafts warning, inapplicable to the forty-nine foot WYNN D II as small crafts are vessels thirty-five feet or smaller. This was later changed to an advisory and it applied to the area outside the San Francisco Bay, not just the South Channel. Third, the visibility was at least four miles as Stevenson and Skipper Martens could see the Marin Headlands. The WYNN D II encountered diminishing seas and winds and neither Stevenson nor Martens, skipper of the GIRLFRIEND III, saw any breaking waves in the Channel. Fourth, the GIRLFRIEND III, without objection or voiced concern from the crew of WYNN D II, went first into the channel, essentially acting as a lookout for the WYNN D II. The district court found that Stevenson and Martens both weighed the high visibility, the favorable conditions and the fact that the South Channel is usually used by smaller vessels, with the possibility of breaking waves in the South Channel during stormy conditions and other possible dangers. The district court made a factual finding that the conditions turned from comfortable to dangerous in a matter of minutes and that huge breaking waves appeared out of nowhere. The Coast Guard instructed the GIRLFRIEND III to turn its bow west and head for deeper water which both skippers did. The district court concluded that there was no negligence in the actions of Stevenson or the crew in the navigation of WYNN D II. Caskie's arguments that Stevenson should have known that breaking waves of that size and the fact it came up quickly existed in the South Channel benefits from hindsight. At the time, the conditions indicated that the South Channel was the safest route. The Coast Guard cutter that came to rescue them did a 360 turn in the breaking waves and turned back, showing that even the Coast Guard was caught unawares and could not predict the conditions.
 
 
 31
 The district court concluded that because the vessel was safe and seaworthy, and no negligence existed on the part of Hechinger or Stevenson and the WYNN D II crew, that the cause of the accident was an Act of God or peril of the sea. Hence, there is no liability on the part of Hechinger, and thus, no liability to limit.III.
 
 CONCLUSION
 
 32
 The district court's findings of fact are not clearly erroneous and its conclusions of law based on those findings are reasonably supported by the evidence. The district court's judgment is affirmed.
 
 
 33
 AFFIRMED.