Scott SPOTTISWOODE

v.

Scott SON.

Civil Action No. 06–11829–RGS.

United States District Court,
D. Massachusetts.

Jan. 23, 2009.

David J. Berg, Latti & Anderson, LLP, Boston, MA, for Scott Spottiswoode.

Scott Son, Ashland, MA, pro se.

## FINDINGS OF FACT AND RULINGS OF LAW AFTER A TRIAL WITHOUT JURY

STEARNS, District Judge.

Based on the credible testimony and the exhibits offered at trial, as well as the stipulations of the parties, I find the following facts.

### The Parties

1. On November 3, 2005, plaintiff Scott Spottiswoode was the record owner of a 32', 250 horse power sport fishing boat named MAXIMUS. Spottiswoode purchased MAXIMUS for $65,100 in January of 2003. Spottiswoode is a fishing enthusiast and had previously owned other fishing boats.

2. MAXIMUS was insured against loss by Travelers Insurance Company (Travelers). The Travelers policy was for "seasonal use." It insured MAXIMUS for losses at sea from the beginning of June through the end of October. The policy's "lay up" clause required the boat to be removed from the water during the winter months.

3. Defendant Scott Son and Spottiswoode had a longstanding friendship. The two men shared a passion for fishing. They often fished together, and used each other's boats interchangeably. Son and Spottiswoode also each permitted the other to borrow their respective boats, so long as the vessel was returned unharmed with a full tank of gas.

### The Fatal Voyage

4. Shortly before midnight on November 2, 2005, Son, accompanied by Alfred Adams,[1] took MAXIMUS from its mooring in Harwichport. The men planned an overnight fishing trip through Nantucket Sound with Provincetown as their ultimate destination.

5. A National Oceanic and Atmospheric Administration (NOAA) small craft advisory for coastal waters was in effect from late Wednesday, November 2 until 1:00 am Thursday, November 3. The NOAA advisory forecast winds 10–15 knots on Wednesday with gusts to 25 knots and seas of 4–6'. Beginning Thursday afternoon and through Thursday night (during which time the loss occurred), a gale warning was in effect for Nantucket Sound and the coastal waters off Cape Cod. The Thursday forecast was for winds 10–15 knots with gusts to 30 knots, building to 25–30 knots with gusts to 40 knots, and seas of 2–4' rising to 4–7'. Son was aware of the forecast, but was of the belief that rough weather would have little effect on a powerboat the size of MAXIMUS.[2]

6. Son had experienced steering problems with MAXIMUS in the past, but believed that the boat was mechanically sound. By 6:00 pm on November 3, Son and Adams had reached the vicinity of #10 Red Buoy, near the tip of Monomoy Island.[3] During the attempt to round Monomoy Island, MAXIMUS's steering system failed. The boat began to drift.

7. The #10 Red Buoy marks the convergence of the waters of Nantucket Sound with those of the Atlantic Ocean. The passage is notorious for its strong currents.

---

1. Adams did not testify at trial.

2. Son was permitted to testify in narrative form as he represented himself pro se at trial.

3. Why it took seventeen hours to progress so short a distance is unexplained in the record.

8. At the time MAXIMUS's steering failed, south-southwest winds were blowing at 25–30 knots. Waves ran 4–7' (as predicted by the NOAA advisory).

9. MAXIMUS began to take on water. Eventually MAXIMUS's two bilge pumps were overwhelmed. While Son was attempting to set the anchor, Adams yelled to him that water was waist high in the cabin. Son and Adams donned survival suits and abandoned ship. Prior to leaping overboard, Son stuffed his cell phone and MAXIMUS's EPIRB [4] into his survival suit.

10. Son and Adams swam to the shore of Monomoy Island and called the Coast Guard. MAXIMUS, which was two-thirds submerged, washed up later on the beach of Monomoy Island. The Coast Guard rescued Son and Adams by helicopter.

*The Unsuccessful Salvage*

11. Spottiswoode, aided by Son and Jonathan David (a friend of Spottiswoode's), attempted to salvage MAXIMUS on November 19, 2005. Although the men succeeded in refloating MAXIMUS on the high tide, within thirty minutes of beginning the trip back to Harwich port, the boat went down in 25' of water.[5] A Coast Guard vessel plucked the three men from the open water of Nantucket Sound.

12. Spottiswoode filed a loss claim with Travelers. On or about November 21, 2005, Travelers denied the claim, citing Spottiswoode's breach of the lay-up clause of the policy. In its rejection letter, Travelers noted that "Mr. Scott Son was using the vessel with your permission when the loss occurred."

13. David testified at trial to an incident a few days prior to the accident involving Son. David had accompanied Spottiswoode to look for Son when Son failed to return from a fishing trip with MAXIMUS as scheduled. David reported that Spottiswoode was upset with Son when he finally reached port because MAXIMUS appeared distressed. Spottiswoode told Son not to take MAXIMUS out again in bad weather.

14. On January 15, 2006, Spottiswoode filed a complaint with the Harwich police accusing Son of using MAXIMUS without his permission. The Harwich officer who investigated the complaint noted in his report that Spottiswoode had made contradictory statements about whether Son had permission to use the boat.[6] Consequently, no charges were brought against Son. The officer also noted in his report that Spottiswoode had no answer for why he left the keys in MAXIMUS "all the time," including after October 28, 2005, the date on which Spottiswoode claimed to have revoked Son's permission to use MAXIMUS.

### RULINGS OF LAW

*Count I. Negligence*

■ Under general maritime law, a plaintiff attempting to establish negligence must " 'demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury.' " *Evans v. Nantucket*

---

4. Emergency Position Indicating Radio Beacon.

5. Although a surveyor was hired by Spottiswoode to locate MAXIMUS, the boat was never found. It was most likely swept by currents into the Atlantic.

6. The officer noted separate conversations with a Travelers investigator and a claims adjuster who reported that Spottiswoode had told them that Son had permission to use the boat.

*Cmty. Sailing, Inc.*, 582 F.Supp.2d 121, 137 (D.Mass.2008), quoting *Canal Barge Co., Inc. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir.2000).

█ Spottiswoode argues that Son was negligent in taking MAXIMUS out onto Nantucket Sound on November 2, 2005, knowing of the NOAA weather advisory. Son, for his part, argues that: (i) a small craft advisory applies to boats 25' or less in length, while MAXIMUS was 32' long; and (ii) that gale force winds are a hazard for sail boats, not motorized vessels the size of MAXIMUS. The court takes judicial notice of the U.S. Coast Guard website definition of a small craft advisory.

> An advisory issued by coastal and Great Lakes Weather Forecast Offices (WFO) for areas included in the Coastal Waters Forecast or Nearshore Marine Forecast (NSH) products. Thresholds governing the issuance of small craft advisories are specific to geographic areas. A Small Craft Advisory may also be issued when sea or lake ice exists that could be hazardous to small boats. There is no precise definition of a small craft. Any vessel that may be adversely affected by Small Craft Advisory criteria should be considered a small craft. Other considerations include the experience of the

vessel operator, and the type, overall size, and sea worthiness of the vessel.[7] *Cf. Matter of Hechinger*, 890 F.2d 202, 209 (9th Cir.1989) ("[T]he National Weather Forecast at 2:00 p.m. on the day of the accident predicted moderate seas with heavy swells and issued a small crafts warning, inapplicable to the forty-nine foot [vessel] as small crafts are vessels thirty-five feet or smaller."). The Coast Guard website further defines a gale warning as "[a] warning of sustained surface winds, or frequent gusts, in the range of 34 knots (39 mph) to 47 knots (54 mph) inclusive, either predicted or occurring, and not directly associated with a tropical cyclone."[8]

A *per se* case of negligence might be made in instances where the master of a ship sets sail in weather conditions so extreme that any reasonable person would recognize the peril.[9] This seems to be the proposition on which Spottiswoode relies, because he offered no expert evidence at trial on the issue of negligence, only a certified copy of the NOAA forecasts for Nantucket Sound on November 2 and November 3, 2005.

In assessing the potential negligence of a vessel's master, courts have looked to a variety of factors: the captain's experi-

---

7. http://www.weather.gov/glossary/ (last accessed January 21, 2009).

8. http://www.weather.gov/glossary/ (last accessed January 21, 2009). A gale warning is a more serious warning on the same continuum that begins with the small craft advisory. http://www.uscg.mil/news/stormcenter/. *See, e.g., In re Seaboard Shipping Corp.*, 449 F.2d 132, 135 (2d Cir.1971) ("[A] Special Lakes Warning was broadcast changing small craft warnings back to gale warnings for that portion of [Lake Michigan]"); *Am. Home Assur. Co. v. L & L Marine Serv., Inc.*, 875 F.2d 1351, 1353 (8th Cir.1989) ("NOAA had upgraded the small-craft advisory in effect for that portion of the Atlantic Coast to gale warnings of winds 20 to 35 knots.").

9. The result is different when the unexpected occurs. *See Book of Jonah* 1:3–4 ("But Jonah rose up to flee unto Tarshish from the presence of the LORD, and went down to Joppa; and he found a ship going to Tarshish: so he paid the fare thereof, and went down into it, to go with them unto Tarshish from the presence of the LORD. But the LORD sent out a great wind into the sea, and there was a mighty tempest in the sea, so that the ship was like to be broken."). *See also* Gordon M. Lightfoot, *The Wreck of the Edmund Fitzgerald* (1976) ("That good ship and true was a bone to be chewed, [w]hen the gales of November came early.").

ence, the anticipated sea conditions, the fitness of the crew, the seaworthiness of the vessel, and the relative risks of the voyage. The evidence here suggests that Son was a seasoned fishing boat operator and was regarded as such by Spottiswoode (who had given him liberty to use MAXIMUS at will). The weather forecast on November 2, 2005, was daunting, but (perhaps) not dire for a 32' fishing boat powered by a 250 horse power engine. There is no evidence that Son's passenger, Alfred Adams, was an unfit crewman or even necessary for the safe operation of the boat. While Son testified that MAXIMUS had had previous problems with its steering mechanism, he considered the vessel to be seaworthy on November 2, 2005. Spottiswoode agreed, testifying that MAXIMUS was well-maintained and had no recent mechanical problems with either the engine or the steering mechanism. Finally, the voyage charted by Son was not a hazardous one. The court takes notice of the fact that the coastal circumnavigation of Cape Cod is a routine day on the water for recreational boaters with ordinary seafaring skills. In sum, while it might have been negligent for Son to have set sail in Nantucket Sound on November 2, 2005, in the face of a small craft advisory, on the evidence at hand, the court cannot say one way or another. Because Spottiswoode has failed to carry his burden of proof on the issue of negligence, judgment will enter for Son. *Cf. Transamerica Premier Ins. Co. v. Ober*, 107 F.3d 925, 931 n. 7 (1st Cir.1997).

*Count II. Conversion*

 The First Circuit looks to Massachusetts law in deciding claims of conversion brought in admiralty. To prevail, a plaintiff is required to show that: "(1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused." *Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 95 (1st Cir.1993). In the instant case, the only disputed element of the conversion claim is whether Son *wrongfully* exercised control over MAXIMUS.

Spottiswoode argues that he revoked permission for Son to use MAXIMUS on October 28, 2005, and that Son nonetheless took the boat out five days later knowing that he was not authorized to do so. The court does not find Spottiswoode's testimony on this issue to be credible for several reasons. (1) David, whom Spottiswoode called as a corroborating witness, did not testify that Spottiswoode had revoked Son's permission to use MAXIMUS. Rather, David testified that Spottiswoode had warned Son against taking the boat out in bad weather. (2) Spottiswoode's conduct was inconsistent with any concern that Son might make unauthorized use of MAXIMUS. He admitted to the Harwich police that he had left the keys in the boat after the alleged October 28 incident. Nor is there any evidence that he gave instructions to employees of the marina where MAXIMUS was docked that Son was forbidden to use the boat. (3) There is no evidence that Spottiswoode blamed Son contemporaneously for the accident. Rather, Spottiswoode enlisted Son's assistance in the November 19 salvage effort. (4) There is no evidence contradicting the two statements attributed to Spottiswoode by Travelers employees that Son was using MAXIMUS with his permission at the time of the accident. (5) The record evidence is that Spottiswoode did not accuse Son of conversion until he made the com-

plaint to Harwich police in January of 2006, *after* he had learned that Travelers had rejected his insurance claim.

In sum, I find that the evidence points to the conclusion that the only conversion that occurred was in Spottiswoode's version of events.

## ORDER

For the foregoing reasons, the court finds for defendant Son on the claims of negligence (Count I) and conversion (Count II). The Clerk will enter judgment for Son and close the case.

SO ORDERED.