**Julianne Marie EVANS, Plaintiff,**

v.

**NANTUCKET COMMUNITY SAILING, INC., a Massachusetts Corporation, Ronan O'Siochru and Donncha Kiely, Defendants.**

Civil Action No. 05–10088–MBB.

United States District Court,
D. Massachusetts.

Oct. 22, 2008.

Alan L. Cantor, David P. Angueira, Edward M. Swartz, Swartz & Swartz, Constance L. Rudnick, Marielise Kelly, Richard A. Gargiulo, Gargiulo, Rudnick & Gargiulo, Boston, MA, Steven D. Miller, Plantation, FL, Jeffrey A. Miller, Boca Raton, FL, for Plaintiff.

Thomas J. Muzyka, Terence G. Kennealy, Clinton & Muzyka P.C., Boston, MA, for Defendants.

## MEMORANDUM AND ORDER

BOWLER, United States Magistrate Judge.

This action arises out of a July 2002 accident during a sailboat race off Jetties Beach in Nantucket. Defendant Donncha Kiely ("Kiely"), at the helm of a Hunter 140 sailboat, jibed the boat during the race. The tip of the boom struck plaintiff Julianne Marie Evans ("Evans"), a passenger sitting port side in a nearby Hunter 140 sailboat. Defendant Ronan O'Siochru ("O'Siochru") was at the helm of the sailboat in which Evans was the only other occupant.

Evans seeks recovery from Kiely and O'Siochru ("defendants") for negligence under general maritime law.[1] Defendants, both instructors at Nantucket Community Sailing, Inc. ("NCS"),[2] submit that Evans was comparatively negligent in her failure to pay attention, keep a lookout for herself and/or notice Kiely's nearby boat. In December 2005, the parties entered into a stipulation that: "the only claims ... that are being presented in this litigation are for the loss of taste and loss of smell;" "there will be no claims ... for loss of earning capacity, either past or future;" and "medical expenses" are limited to "expenses that are related to loss of smell and taste."[3] (Docket Entry # 61, Ex. D).

During a four day bench trial, this court heard the testimony of Evans, defendants and the following witnesses: (1) Alan Richard Hirsch, M.D., F.A.C.P. ("Dr. Hirsch"), a board certified neurologist and psychiatrist testifying on Evans' behalf; (2) Janice Chamberlain ("Chamberlain"), Evans' twin sister; (3) Robert I. Henkin, M.D., Ph.D. ("Dr. Henkin"), a professor in the departments of neurology and pediatrics at Georgetown University testifying for defendants and the Director of the Center for Molecular Nutrition and Sensory Disorders, Taste and Smell Clinic, a research organization which also treats patients;[4] (4) Julia Anderson ("Anderson"), a personal friend of Evans; and (5) Michael K. Ackland, M.D. ("Dr. Ackland"), an orthopedic surgeon. With the parties having filed proposed findings, the matter is ripe for review.

### FACTUAL FINDINGS

Evans, a Florida resident who was 39 years old at the time of the accident, grew up in Michigan. She lived there until the age of 22 at which point she moved to Florida. In 1976 or 1977, she was diagnosed as having Charcot–Marie–Tooth disease ("CMT"), a nerve disorder affecting the circulation in her feet.[5] Thereafter,

1. The amended complaint is based on diversity jurisdiction.

2. The parties stipulated to the dismissal of NCS, a former defendant, in November 2007. (Docket Entry # 85).

3. After hearing oral argument on Evans' motion to revoke the stipulation (Docket Entry # 57), this court denied the motion on January 17, 2007.

4. Dr. Henkin is not board certified.

5. Dr. Henkin explained that CMT is a genetic abnormality that usually manifests as peripheral neuropathy. The disorder affects sensation in the lower extremities and produces high arched feet with hammer toes making it difficult to walk.

she underwent a series of operations until the age of 22.

In Michigan, she lived on a lake where her father was president of a sailing club. From age six to 12, she sailed all day long for six summers. She usually sailed sun fishes, which have one sail, and less frequently catamarans or snipes.[6] To compare a sun fish to a Hunter 140, the latter is one to two feet longer, has two sails (a mainsail and a jib) and a seating area along both sides of the boat. After age 12, Evans sailed once as a passenger in a boat in Florida in 1985 prior to the July 5, 2002 accident.

Before the accident, Evans pursued an interest in gardening to the extent of obtaining a master gardening certificate in 2002. The certificate is in effect for a one year period. At some point in 2002, she opened a home and garden design company. Before July 5, 2002, she worked on gardening projects for clients in the Florida climate which she described as subtropical and therefore suitable to flowers and plants with significant smells. Although she enjoyed gardening and her sense of smell played a role in her design of scent gardens prior to the accident, she did not cultivate a scent garden in either of the two places she lived in Florida.

In 1998, Evans obtained a real estate license and sold commercial real estate. In 1995 or 1997, she also began selling high end luxury homes. Oftentimes, she entertained real estate clients by taking them out to dinner and enjoyed selecting fine wines.

In addition to gardening, she enjoyed cooking as a hobby prior to the accident particularly during holidays and with her sister who lived in Connecticut. Before the accident, she also entertained at home by cooking approximately three times a month. She did not, however, take cooking classes and she ate at restaurants several times a week when she "didn't feel like cooking."[7] The accident did not affect her ability to pursue other hobbies such as tennis, swimming, skiing and racquet ball.[8] On direct, she testified that her loss of taste has affected her entire life because she can no longer enjoy going out to dinner, tasting food, smelling the grass when she mows the lawn or smelling a baby or a man.

After her mother died in February 2002, Evans decided to spend the summer in her favorite place, Nantucket, where she had visited for one or two weeks during the summer from 1997 to 2001. She arrived at the island on or about June 18, 2002.

On July 5, 2002, Evans read an article in a Nantucket paper about sunset sailing races and a barbecue offered by NCS at Jetties Beach for the summer with the first night that evening. Sunset that day was 8:17 p.m. *The Inquirer and Mirror* newspaper that week carried two notices about the races, one appearing in the sports section stating that the activities began at 5:30 p.m. and the other appearing in the island calendar section noting that the event began at 8:00 p.m. (Ex. 1 & A). Evans testified to seeing only the notice with the 8:00 p.m. start time.

---

6. When describing the events of July 5, 2002, however, Evans testified that she only sailed sun fishes and had an apprehension about the NCS boats because they were longer than sun fishes.

7. This court therefore discounts to a degree Evans' post accident loss of enjoyment in cooking.

8. She also had an interest in birds and in the summer of 1989 and 1990 traveled to different regions in the United States researching birds for a book she wrote.

NCS engaged in the informal racing activities on Friday evenings to generate community interest in racing and NSC instructors often took part in the races. Participants either brought their own boats or used boats provided by NCS. They typically brought their own food and NCS provided a grill.

After reading the notice, Evans telephoned the NCS number and inquired about joining the club and getting sailing lessons before she joined. As a result of the conversation, Evans went down to Jetties Beach at 5:00 p.m. in pursuit of a sailing lesson. The first person she spoke to was Darragh Connolly ("Connolly"), who Evans described as the person in charge of the club. She told Connolly that she had not sailed in 20 years.

Connolly, O'Siochru's supervisor, then approached O'Siochru, who was on the beach rigging a Hunter 140 in preparation for the race. Connolly asked O'Siochru, who already had a crew for the race, if he could take out Evans instead. Connolly also informed O'Siochru that Evans had prior sailing experience. Evans then came down from the office and Connolly introduced her to O'Siochru. O'Siochru asked Evans various questions about her sailing experience such as how often she had sailed and the kind of boats she had sailed. He therefore knew that Evans had sailed in sun fishes but, to his knowledge, had never applied for sailing lessons at NCS.

O'Siochru never gave sailing lessons after 5:30 or 6:00 p.m. He also never used Hunter 140s for sailing lessons because they were awkward and inefficient for such a use. He explained that Hunter 140s are difficult for a teacher at the helm to change places with a student in order to teach the student how to steer. Evans never asked O'Siochru for a sailing lesson

on July 5, 2002, and never asked O'Siochru to return to shore prior to the accident.

At around 6:05 p.m., O'Siochru pushed the Hunter 140 into the water with Evans on board and the two sailed together jibing and tacking in preparation for an informal race. Evans told O'Siochru that she had sailed on sun fishes before and the principles of both tacking and jibing are exactly the same for the two boats. They sailed for an estimated ten to 20 minutes before the race and 20 to 30 minutes before the accident. Wind speed was approximately ten knots in a direction coming from the water onto the shore.[9] O'Siochru controlled the mainsheet and tiller while Evans took hold of the jib. During that time, O'Siochru noticed that Evans "was not as mobile" on the boat and could not move from side to side of the boat as he had expected. Evans explained to O'Siochru that she had problems with her legs. She could nevertheless move and did move from side to side whenever O'Siochru asked her to move.

During the estimated 15 minute period before the race began, O'Siochru told Evans how to jibe and how to work with the direction of the wind. She appeared fully capable of handling the jib and adequately responded to all of O'Siochru's commands. Notwithstanding Evans' testimony to the contrary, the jib, which was usually in a cleat, was not difficult to hold. In fact, the seven and eight year old children O'Siochru instructed never had any difficulty holding the sheet for a jibe. O'Siochru also told Evans to keep her head down as the boom went across whenever they were tacking or jibing. Evans had no difficulty positioning herself on the rail of the boat. She never outwardly indicated to O'Siochru that she could not handle the jib.

9. The Hunter 140 does not have instrumentation to measure the speed of the boat or the space from another boat. The boat does, however, have a small wind indicator.

There was no meeting among race participants before the race or any agreement about what rules would apply to the informal race. O'Siochru testified that, "racing rules follow the same as maritime rules to avoid collisions at sea."

The race began at an imaginary, 30 meter starting line drawn between a committee boat belonging to NCS and a course buoy.[10] At all times before the accident, Evans appeared to be enjoying herself and was well within her comfort zone. At the start of the race, the six Hunter 140s were all vying for a position sailing parallel to the starting line in close proximity to each other and, at times, as close as two to three feet.[11] O'Siochru and Evans tacked and jibed prior to a loud whistle signifying the start of the race.

In the face of such testimony, this court finds Evans' testimony on direct that she thought O'Siochru was giving her a free sailing lesson in the estimated 15 to 20 minute period before the race[12] and that she was in a sailing lesson after that time was not credible.[13] In fact, she testified that at the time of the injury she was just sailing back and forth. The circumstances, however, including O'Siochru's and Kiely's testimony, establish that there was a race about to take place when Evans boarded the Hunter 140 with O'Siochru. There were five other identical Hunter 140s in the water and they were tacking

and jibing near the imaginary starting line. O'Siochru coached Evans regarding how to use the jib before the race. Three, two and one minute had whistles preceded the start of the race.[14] O'Siochru and Evans crossed the imaginary starting line with five other identical boats which were all jockeying for position prior to the start. Buoys marked the race and O'Siochru steered the boat toward the first buoy and completed four legs marked by buoys prior to the accident. Evans was in the race and voiced no objection during the ten to 15 minute period before the accident. She also safely performed all the maneuvers O'Siochru requested during that time period.

During the fifth leg of the race and with the wind behind her, O'Siochru's boat headed toward a buoy marking the course. The course required O'Siochru to sail to the left around the buoy. Having completed a jibe, the boom of O'Siochru's boat was on the starboard side. Tending the jib, Evans was sitting on the port side edge approximately one third the way from the bow.[15]

With the boom on the port side, Kiely's boat approached O'Siochru's boat to the port side of O'Siochru's boat traveling at an estimated speed of at least three knots and more than likely four knots. Kiely was taking a more direct route sailing downwind toward the next buoy. Evans

10. Exhibit E designates the committee boat with a letter "Y."

11. Given the circumstances, Evans' testimony that "she never saw one other boat near [them]" lacked candor.

12. She also testified that O'Siochru and she were off at a distance from the other five boats.

13. Another example of Evans' inconsistent testimony occurred when she testified that she did not know or hear from any source in the summer of 2002 that a head injury could result in a loss of taste and smell. Elsewhere,

she testified that Peter Florio, who worked at an information booth on the island, told her that a loss of taste and smell was common with a head injury.

14. Evans' testimony that she never heard the whistles signifying the start of the race is indicative of a lack of candor that colored her testimony.

15. O'Siochru marked exhibit B, picture four, with an "X" to designate the vicinity where Evans sat.

kept her back to Kiely's boat and never glanced to see the distance between the two boats or the relative positions of the boats to each other. At approximately five to ten meters from the course buoy and with the two boats an estimated two to three feet apart, Kiely called over to O'Siochru that Kiely's boat had the right of way. Evans, who was not paying attention at all to the communications between Kiely and O'Siochru, did not pay attention to the command and/or the warning of the impending jibe subsequently made by Kiely.

O'Siochru's boat, which was flat with the wind behind it, was traveling at a speed of approximately three and a half to four knots. As the give way vessel with the wind on the port side, O'Siochru acknowledged that Kiely's boat had the right of way. O'Siochru thus knew that his boat had to yield the right of way and that he was under an obligation to avoid a collision if on a collision course with another boat. O'Siochru also understood it was his obligation to make sure there was enough distance between the two boats to allow Kiely's boat to sail unimpeded.

Shortly before the accident, the two boats were sailing parallel to each other and at one point came as close as one and a half feet from each other. O'Siochru was constantly adjusting the tiller to maintain what he thought was a sufficient distance of two to three feet between the two boats. Ten to 15 seconds before Kiely jibed, however, O'Siochru moved toward Kiely's boat, which was on a more direct line toward the buoy. The move took Kiely off his line thereby impeding the course of Kiely's boat. Five to ten seconds before the accident and because the boats were too close,

O'Siochru, still the give way vessel, pulled the tiller slightly toward his body thereby bringing his boat slightly to the right and opening up a small, two to two and half foot space between the boats. Having already moved toward Kiely's boat, this small additional space was not enough to avoid the accident.

Seconds before the accident and to avoid a potential collision because the space between the boats remained too small, Kiely, who was controlling the mainsail and operating the tiller, called "jibe" and thereafter jibed his boat. The jibe turned Kiely's boat to port in a direction away from O'Siochru's boat. Evans, however, was not paying attention to what Kiely was saying or doing. Kiely's boat was close enough to O'Siochru's boat such that Evans could have heard the command.[16] If she had listened or paid attention, she would have been more vigilant to her surroundings given the close proximity of Kiely's boat and the risks presented. She would have known that Kiely's boat was about to jibe and that the boom would therefore travel in her direction. Moreover, she had sufficient time, albeit seconds, to protect herself by ducking or moving her head.

The boom, then on the port side of Kiely's boat, swung over to the starboard side. Kiely estimated that the boom extended slightly less then three feet from the outside of the boat. At the time, Kiely was cognizant of various factors such as the wind direction, the speeds of the boat and the jibe as turning his boat away from O'Siochru's boat. Kiely then misjudged the space between the two boats as sufficient to avoid the boom hitting a crew

---

**16.** This court does not find Evans' testimony that she heard O'Siochru yell "jibe" credible. O'Siochru did not prepare or ready his boat for a jibe at that time. Instead, he had just completed pulling the tiller slightly toward his body to create more space between the two boats. Evans additionally testified that she was startled by O'Siochru's voice and looked down to her left over her left shoulder and thought that Kiely's boat, with only five to six inches of sea space, hit O'Siochru's boat.

member or passenger in O'Siochru's boat. As a result, as the boom swung from port to starboard side on Kiely's boat, the end of the boom hit the upper part of Evans' neck causing her to fall forward into the cockpit with her eyes closed whimpering in pain. Kiely did not see the boom strike Evans and the boats did not collide. Instead, he continued racing until he noticed that O'Siochru had stopped sailing.

When the boom struck Evans, O'Siochru immediately stopped racing and called for assistance. Connolly came out in an NCS motor boat and pulled the Hunter 140 to shore. In the meantime, O'Siochru tended to Evans who was lying in the boat speaking in a whispering tone. She experienced approximately ten minutes "of in and out consciousness" (Ex. 3) and has no memory of what took place until she got to shore.

Paramedics arrived at 6:41 p.m. and transported Evans from the beach to the Nantucket Cottage Hospital ("the hospital"). O'Siochru also went to the hospital where he stayed until Evans' discharge. Evans was awake and conscious during the transport. At the hospital, she was alert and had no motor sensory deficit.[17] X-rays of Evans' cervical spine proved negative for any fracture and a CT scan of her head showed no evidence of an intra cranial trauma. She complained of neck pain. Discharged that evening, she received a prescription for Percocet and instructions to use Motrin and apply ice for 15 minutes every two hours.

Connolly drove her back to the house she was renting for the summer. Meanwhile, O'Siochru and another NCS instructor retrieved Evans' car at Jetties Beach and drove it back to Evans' house. Kiely, Connolly and Connolly's girlfriend visited Evans the next morning, bringing her a newspaper, a cup of coffee and a bagel. Evans told the three individuals not to worry and that she would not sue anyone.[18] Each morning for the next ten days, Connolly's girlfriend walked Evans' dog and brought her a cup of coffee in the morning.

On Friday, July 12, 2002, O'Siochru saw Evans at Jetties Beach where he was preparing a Hunter 140 for the evening race. He did not have a conversation with her at that time or at any other time after July 5, 2002. Contrary to Evans' testimony, O'Siochru did not see or speak to Evans two weeks after the accident at the Friday evening event. O'Siochru never stated that the accident was his fault or otherwise insinuated that he was responsible.

O'Siochru learned to sail as a teenager in Ireland. He had sailed as well as raced with or against Kiely hundreds of times before the July 2002 accident. Both O'Siochru and Kiely had considerable experience sailing and before the accident O'Siochru was familiar with the manner in which Kiely sailed. Kiely, who started sailing at the young age of six or seven, had prior racing experience and worked as an assistant instructor at the Royal Cork Yacht Club for four summers before 2002. Kiely had not sailed a Hunter 140, however, prior to the summer of 2002.

Evans had no difficulty with her sense of smell or taste before the accident. She first noticed a loss of her sense of smell and taste when, ten days after the accident, she could not smell her dog's feces. In the middle to later part of July, Evans went to eat at a local coffee house several times a week. At each visit, she ordered lobster eggs benedict but noticed that she

---

17. The hospital records do not contain a diagnosis of a concussion. Evans' testimony that she did not move for five and a half hours after the accident is not convincing and inconsistent with the hospital records.

18. Evans changed her mind because her condition worsened.

could not taste the food. She repeatedly sent the meal back to the chef during that three week time period.

On July 25, 2002, Anderson, a longtime friend since 1990, came to stay with Evans. During the July 25 to 29, 2002 visit, Evans complained of neck pain although the two went shopping, sightseeing and walking on the beach. They also went out to eat at restaurants as well as once to the movies and once bike riding.[19] When the two went out to eat, Evans oftentimes sent the meal back, complained about the taste to waiters and poured salt on her food. Because of her continued attempts to taste food, Evans' weight of 150 or 155 pounds prior to the accident increased to a range of 170 to 179 pounds after the accident.

Anderson, who has lived in a different state from Evans since 1992, still maintains the friendship. In 2004, the two spent 12 days together in Hawaii. Evans frequently asked Anderson to smell the flowers that Evans identified. When they went out to eat, Anderson testified that Evans acted frustrated and at one point began to cry.

On or about August 8, 2005, Julie Daenzer Bocquet ("Bocquet") and her mother in law came to visit Evans. On August 8, 2002, all three of them were planning to go to Boston to shop.

Before going to Boston, they visited Brant Point Lighthouse. Evans lost her balance on a ramp and fell. She heard a loud popping noise in her left ankle and went to the hospital complaining of ankle pain. The ankle was swollen and tender with a limited range of motion due to pain. Diagnosed with a sprained left ankle, she was discharged the same day with instructions to rest and elevate the leg, stay off her feet, use crutches for the next two to three days and ice the ankle every two hours. She also received an air cast.

Walking with crutches, she experienced pain in her right wrist and went to the hospital's emergency room on August 28, 2002. Hospital records place the injury's onset at three weeks earlier and further note the fall at that time. X-rays showed a small fracture and soft tissue swelling. The wrist was splinted and Evans was discharged with instructions to take Motrin three times a day for pain. Because of a greater concern for her other injuries, Evans did not report the loss of smell or taste during either the August 8th or the 28th visit to the hospital. Meanwhile, the hospital could not procure an appointment with the orthopedist, Dr. Ackland, on the island. An appointment was therefore scheduled at Dr. Ackland's Hyannis office.

Between August 28 and September 17, 2002, when Evans left the island, she told Peter Florio ("Florio"), who worked at an information booth on Straight Wharf, that she had lost her sense of smell and taste.[20] Florio told Evans that a loss of taste and smell is common with head injuries at which point Evans reasonably understood that the head injury on July 5, 2002, was a cause of the problems with her taste and smell. She did not advise anyone at NCS about the loss of taste and smell during the summer of 2002.

On September 17, 2002, Evans left the island to stay in Chatham. On September 18, 2002, she went to her first appointment at Ackland Sports Medicine, Inc. and saw Mark Colucci ("Colucci"), a certified physician's assistant. After Colucci assessed her condition, he developed a plan for Ev-

---

**19.** Evans testified that before Anderson's visit it was almost impossible to walk because of her neck.

**20.** Even before this time, she told both Anderson and Bocquet about the loss of her sense of taste and smell. She also told Jeremy Feldman, another person who worked at the information booth.

ans to undergo a course of physical therapy for the ankle, continue the wrist splint and obtain a magnetic resonance imaging scan ("MRI") of the cervical spine. Dr. Ackland reviewed and approved the plan which also included referring Evans to a cervical specialist for a consult.

Evans reported the loss of smell and taste to Colucci. He did not record the complaint, however, because it was outside the orthopedic specialty of the practice.

Evans returned to Dr. Ackland's Hyannis office on October 15, 2002, after seeing the cervical specialist. At this visit, Dr. Ackland examined Evans who complained of continued wrist and ankle pain. In addition to problems with her neck, wrist and other injuries, she told Dr. Ackland that she could not taste or smell. She was "stunned" when Dr. Ackland, who was not a taste and smell specialist,[21] told her that it was never coming back.[22] Dr. Ackland proceeded to treat her chief complaint, to wit, the cervical strain.

The following day on October 16, 2002, Evans began driving to Michigan where she stayed for a period of time until returning to Florida on November 15, 2002.[23] Upon her return, she went to see her primary care doctor in January 2003. The majority of the discussion during the visit revolved around her neck and back. When she asked her primary care doctor if he knew of a doctor who could treat the loss of taste and smell, he said she had too many other injuries that were more important.[24] Evans took his advice.

On April 9, 2003, Evans was seen by Hubert Rosomoff, M.D. ("Dr. Rosomoff"), a neurologist, for an evaluation. She spoke with him about her neck, wrist and back injuries as well as the loss of taste and smell. When asked if he provided her with any care or treatment related to her loss of taste or smell, Evans responded, "No."

Evans thereafter returned to her primary care physician who referred her to an orthopedic physician who likewise did not treat her for the loss of taste and smell. She did not see another physician related to the loss of taste and smell until October 2004. At that time and in connection with this litigation, she saw Dr. Norman Mann, Ph.D. ("Dr. Mann"), a well known physician and specialist in the area of taste and smell disorders at the University of Connecticut.[25] She underwent a series of tests related to taste and smell over the course of a three day time period and received a diagnosis of a permanent loss of taste and smell. (Docket Entry # 94, P. 110, ln. 19–22).

The next physician Evans saw concerning the loss of taste and smell was Dr. Henkin who evaluated her condition on July 28 and 31, 2006. Although not board certified, Dr. Henkin, defendants' expert, has extensive experience and expertise in the area of taste and smell as well as a

---

21. There is no subspecialty certification in neurology or in any other field of medicine for smell and taste. That said, Dr. Ackland is an orthopedic surgeon who specializes in reconstructive surgery of the knee and shoulder.

22. This court does not consider this testimony for the truth of the matter asserted that it was never coming back.

23. Before she left Massachusetts, she met with an attorney concerning her injuries. She also went to the records room of the hospital and collected films of her injuries. In December 2002, she hired an attorney.

24. This court does not consider the statement for the truth of the matter asserted but, instead, for the purpose of explaining why Evans did not receive treatment for the condition.

25. Trial testimony established that Drs. Mann, Henkin and Hirsch are all widely known specialists in the area of taste and smell orders.

medical degree and a Ph.D. He is a former chief of the neuroendocrinology section at the National Institutes of Health and a former professor of pediatrics and neurology and Director of the Center for Molecular Nutrition and Sensory Disorders, Taste and Smell Clinic at Georgetown University Medical Center. In 1986, he took the program to the private sector. Presently Director of the Center for Molecular Nutrition and Sensory Disorders, Taste and Smell Clinic, Dr. Henkin performs clinical research and treats patients.

During the two day visit, Evans underwent a series of tests to detect her ability to taste and smell similar to tests she underwent at the University of Connecticut. Dr. Henkin measured her ability to detect and recognize salty, sweet, sour and bitter tastants. He also tested Evans' ability to detect and recognize certain pungent odors including those that smell similar to dead fish and bitter almonds. Evans could detect the tastants but could not recognize them. Dr. Henkins therefore diagnosed Evans as having a taste disorder referred to as type I hypogeusia.[26]

The tests Dr. Henkin performed for smell revealed that Evans could detect the smell in almost all cases and could recognize and articulate some of the smells but only at concentrations higher than normal. Evans herself confirmed that during one smell test she could smell the odor and that it smelled horrible. Evans' olfactory system was therefore anatomically intact which correlates with her brain being intact, a finding Dr. Henkin supported by a normal MRI of her brain on July 31, 2006. Dr. Henkin thus diagnosed Evans as having a smell disorder known as type II hyposmia.

Dr. Henkin additionally diagnosed Evans as having hypothyroidism, a condition that can cause a loss of smell and taste as well as weight gain. Evans thereafter consulted with her primary care physician who concurred that she had hypothyroidism and prescribed Synthroid, a medication that can correct the condition. Upon taking the medication for two months, Evans admitted that she became aware of an odor. She has been on varying dosages of Synthroid since that time.

On November 17, 2006, plaintiff underwent one day of testing with Dr. Hirsch, the owner and neurological director of the Smell and Taste Treatment and Research Foundation in Chicago, Illinois. Like Dr. Henkin, who Dr. Hirsch described as a grandfather of smell and taste, Dr. Hirsch specializes in the area of smell and taste.[27] He sees patients, performs research on drugs to treat smell and taste disorders and investigates smells and taste at the foundation, which is a medical corporation.

Dr. Hirsch conducted a physical and a neurological examination, undertook a complete medical history and administered a series of smell and taste tests[28] on Evans to determine the degree of diminishment or total loss of her smell and taste. He also performed a psychological examination to rule out any malingering. The examination showed an absence of both malingering and major depression. Like Dr. Henkin, he also reviewed the medical record.

---

26. Contrary to Evans' hearsay testimony, he did tell her she had ageusia.

27. As previously noted, there is no subspecialty certification for smell and taste. Dr. Hirsch is board certified in neurology and psychiatry whereas Dr. Henkin lacks such board certification.

28. Tests performed included the Alcohol Sniff Test, the Unilateral Phenyl Ethyl Acetate Test, the Sniff Aptitude Test, the German Olfactory Threshold Test, the Unilateral University of *Pennsylvania* Smell Test and a number of amyl acetate odor tests.

He diagnosed Evans as having a misperceived sense of smell, referred to as cacosmia, as well as a reduced ability to smell known as hyposmia. In contrast to Dr. Henkin, Dr. Hirsch opined that Evans had no ability to taste, a condition known as ageusia, and that she hallucinated smells, a condition known as phantosmia. Dr. Hirsch further thought that the conditions were post traumatic in origin and superimposed upon by the hypothyroidism.

Dr. Hirsch testified that the tests are designed to be objective, a finding successfully weakened to a degree on cross examination. On direct, he also testified inconsistently that all of the taste tests "were consistent with ... a reduced ability to taste" even though he opined that Evans had ageusia. He also posited that the results of the Sniff Magnitude Test were consistent with a rupture of Evans' olfactory nerve through the cribriform plate [29] even though he opined that she still had an ability to smell, albeit sharply reduced with the vast majority of olfactory nerves completely sheared. He unconvincingly distinguished his diagnosis of Evans as having hyposmia but not being anosmic as dependent upon whether one wanted to "split hairs." Dr. Henkin, in turn, was more specific in diagnosing Evans as having type II hyposmia, a finding supported by test results evidencing that she could detect almost all of the odors and could recognize some odors at higher concentrations. Dr. Henkin was also more specific with tests to support the distinction between Evans' ability both to detect and to recognize tastants and odors. For these and other reasons, including the normal MRI, this court concurs with the findings and opinions of Dr. Henkin relative to the nature and depth of the injury to Evans' taste and smell.

Evans suffered a post concussive syndrome as a result of the head injury on July 5, 2002.[30] Such a physical injury can, as it did in Evans' case, negatively impact an individual's ability to detect and recognize smells as well as taste. A loss or damage to taste and smell usually presents itself within one month of a head injury. Given the inability to detect the smell of feces ten days after the accident as well as the testimony from Anderson and Evans about restaurant meals prior to the August 8, 2002 fall, the July 5, 2002 accident proximately caused the type II hyposmia and the type I hypogeusia. The condition also did not resolve itself after Evans received medication for hypothyroidism.[31]

Evans' ability to detect and recognize odors is better than her ability to detect and recognize tastants and, as noted previously, the sense of taste is 90% smell. That said, Evans' trauma induced condition is permanent in nature and neither the type II hyposmia nor the type I hypogeusia is likely to improve during her lifetime. The onset of Evans' hypothyroidism more than likely occurred after as opposed to before the July 5, 2002 accident even though, as noted by Dr. Hirsch, an individual can have hypothyroidism "and not know it."

At one point after the accident, Evans left a plastic container in the oven at a time when the oven was not being used. When she turned the oven on a week later, she did not smell the smoke or realize the existence of a fire until she heard a loud boom at which point she extinguished the fire with a fire extinguisher. At another

29. The olfactory nerve runs from the top of the nose to the brain. An individual with a sheared or ripped olfactory nerve loses all sense of smell. There is no current medical treatment for a fully ripped olfactory nerve.

30. Both Dr. Hirsch and Dr. Henkin diagnosed Evans as suffering from a post concussive syndrome.

31. The discussion section contains additional causation findings.

point, she was unable to smell a gynecological infection and at another time experienced food poisoning from eating bad food. She also ate a piece of soap labeled chocolate.

On July 2, 2007, Evans saw an endocrinologist to treat her hypothyroidism. She continues to see this endocrinologist for hypothyroidism and remains on Synthroid at varying dosages.

## DISCUSSION

Invoking diversity jurisdiction, the amended complaint sets out a claim for negligence. The answers to the amended complaint submit that " [s]ubstantive [g]eneral [m]aritime [l]aw" applies to the cause of action.

■ Neither party disputes the application of maritime law. The accident occurred on a boat in navigable waters and involved injuries occurring on board a sailboat during a sailboat race thereby bearing a significant relationship to a traditional maritime activity. Accordingly, this court adheres to the parties' position that substantive maritime law applies. *See Transamerica Premier Ins. Co. v. Ober,* 107 F.3d 925, 930 n. 5 (1st Cir.1997); *Butler v. American Trawler Co., Inc.,* 887 F.2d 20, 21–23 (1st Cir.1989); *Hamburg–Amerika Linie v. Gulf Puerto Rico Lines, Inc.,* 579 F.2d 115, 117 (1st Cir.1978) ("district court should properly apply federal maritime law once it has determined that the tort is a maritime one even when diversity jurisdiction is invoked"); *see also* 1 Robert Force and Martin J. Norris *The Law of Seaman* § 1.13 (2003) (navigable waters includes inland waters).

Defendants deny any negligence, including the existence and breach of any duty of care owed to Evans. They further submit that the accident resulted from an exculpatory error of judgment. They contend that Evans was negligent thereby reducing any award of damages by the percentage of such comparative fault. Finally, defendants assert there is no causation between any loss of smell or taste and the accident because the losses resulted from Evans' hypothyroidism which is successfully controlled by Synthroid.

Evans denies any negligence and maintains that defendants are wholly at fault. She seeks a recovery of $2.5 million.

Although not plead to include a declaratory action for insurance coverage or to include the insurer as a party, Evans additionally requests a finding of fact that will establish such coverage under a 2002 insurance policy owned by NCS, the insured.[32] Evans alleges that the policy provides coverage for acts of NCS employees that fall within the scope of their employment while performing duties related to NCS' business. As set out in open court on the fourth day of trial, defendants objected and pointed out, correctly, that the parties agreed to dismiss NCS "with prejudice and without interest, costs or attorneys fees." (Docket Entry # 85). Their liability, if any, is in their individual capacity. Whether either O'Siochru or Kiely is covered under an NCS insurance policy has not been expressly or impliedly pled and is not an issue in this case.

## I. *Negligence*

■ Defendants initially submit that Evans was a willing participant in a sailboat race and that neither O'Siochru nor Kiely breached a duty owed to Evans during the race.[33] They also point out that

---

**32.** The insurance policy is not in evidence.

**33.** This court does not construe the argument as asserting that an assumption of the risk doctrine applies to the sporting event of the sailboat race. Although defendants raised assumption of the risk in their answers, they did not raise or refer to the doctrine by name in the trial brief or in the proposed findings. (Docket Entry ## 84 & 99). It is also highly

the mere existence of an accident or a mere error of judgment or mistaken belief by Kiely in believing the boom would not strike Evans does not, without more, amount to negligence.

■ Defendants are correct in their premise that a court should not employ hindsight but, rather, "should put itself in the position of that master at the time of the circumstances at bar." *The H.F. Dimock,* 77 F. 226, 229 (1st Cir.1896). Furthermore, liability for a collision or other type of maritime casualty is based on fault. *See* 2 Thomas J. Schoenbaum *Admiralty and Maritime Law* § 14–2 (2004) (liability for collisions and "other types of maritime casualties is based upon a finding of fault"); *see also Ching Sheng Fishery Co., Ltd. v. U.S.,* 124 F.3d 152, 158 (2nd Cir. 1997) ("[c]ollision liability is based on fault; the mere fact of impact has no legal consequence") (quoting G. Gilmore & C. Black, *The Law of Admiralty* § 7.2 (1975)); *Complaint of G & G Shipping Co., Ltd. of Anguilla,* 767 F.Supp. 398, 404 (D.P.R. 1991) ("[c]ollision liability is based on fault, a concept that presupposes a common standard of appropriate conduct") (citing G. Gilmore & C. Black, *The Law Of Admiralty* § 7–3 (1975)). As discussed below, however, Kiely's conduct in undertaking a jibe and misjudging the distance between the boom and Evans as sufficient under

the facts and circumstances at the time, amounted to negligence. O'Siochru was also negligent.

■ Negligence not only "cuts a wide swathe" throughout general maritime law but "may be invoked by virtually anyone who suffers injury or loss in an admiralty setting." 1 Thomas J. Schoenbaum *Admiralty and Maritime Law* § 5–2 (2004). Establishing negligence under general maritime law requires the plaintiff to " 'demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury.' " *Canal Barge Co., Inc. v. Torco Oil Co.,* 220 F.3d 370, 376 (5th Cir.2000); *see Tunney v. McKay,* 2000 WL 33116537 *4 (D.Conn. Nov.27, 2000) (stating same elements for cause of action by and against helmsman of one boat and owners of both boats for negligence during sailboat race).

■ To exonerate themselves of negligence, defendants rely on specific navigational rules, 33 U.S.C. §§ 2001, 2002, 2012 & 2013, applicable to inland waters.[34] These navigational rules, which are set out in the Inland Navigational Rules Act of 1980 ("INLRA"), 33 U.S.C. §§ 2001–2073, "apply to all vessels upon the inland waters of the United States." 33 U.S.C. § 2001(a) (Rule 1). The other potentially applicable set of rules referenced by defendants is the COLREGS,[35] a set of interna-

debatable whether the doctrine applies. *See Gleason v. Adelman,* 2000 WL 1724471, *2–3 (Mass.App.Div. Nov.14, 2000) (collecting relatively "sparse" authority regarding assumption of the risk in collisions during boat races and finding the defense did not apply). Instead, defendants phrase the argument regarding Evans' willing participation in terms of the absence of a duty. (Docket Entry # 84; "defendants contend that neither O'Siochru nor Kiely breached any duty owed to the plaintiff who willingly participated in the informal sailboat race on July 5, 2002"); (Docket Entry # 99; "plaintiff has offered no evidence that the defendants breached an alleged duty" and submit in the same para-

graph "that the weight of the evidence supports the conclusion that the plaintiff was a willful participant in sailboat racing on July 5, 2002").

34. Defendants state that "the COLREGS govern the race's activities" (Docket Entry # 99, p. 24) but then cite and rely upon the above noted inland navigational rules (Docket Entry # 99, pp. 24–27).

35. Evans, as the plaintiff, has the burden to establish negligence. *Naglieri v. Bay,* 93 F.Supp.2d 170, 174–175 (D.Conn.1999) (the plaintiff has the burden of proof to establish general maritime negligence cause of action).

**138**

tional rules established by treaty in the Convention on the International Regulations for Preventing Collisions at Sea ("COLREGS" or "the 1972 Convention") and codified at 33 U.S.C. foll. § 1602. As succinctly stated by a leading commentator, "There are two sets of Rules of the Road, one applicable to navigation on the high seas or U.S. territorial seas (International), the other applicable to navigation on the inland waters of the United States and the Great Lakes (Inland)." 8 *Benedict on Admiralty*, § 9.05 (2007).

■ As enacted in the United States, the 1972 Convention defines the vessels that are subject to the COLREGS in 33 U.S.C. §§ 1603 and 1604. *See generally Martha's Vineyard Scuba Headquarters, Inc. v. Unidentified, Wrecked and Abandoned Steam Vessel*, 833 F.2d 1059, 1066 (1st Cir.1987). Paralleling the provisions of Rule 1 of the INLRA rules, 33 U.S.C. § 2001(a) ("these rules apply to all vessels upon the inland waters of the United States"), section 1604 states that the COLREGS "do not apply to vessels while in the waters of the United States shoreward of the navigational demarcation lines dividing the high seas from harbors, rivers, and other inland waters of the United States."

33 U.S.C. § 1604 ("section 1604"); *see* 33 U.S.C. § 1603 (except as provided in section 1604, COLREGS apply to vessels under American flag "while upon the high seas or in waters connected therewith navigable"); 33 C.F.R. § 80.01(a). The Coast Guard has the delegated authority to establish the demarcation lines dividing the high seas from inland waters. 33 U.S.C. § 151; *U.S. v. Woodbury*, 175 F.2d 854, 856 (1st Cir.1949) (area where collision occurred was "within inland waters as defined by the Commandant of the Coast Guard pursuant to the authority conferred upon him by [33 U.S.C. § 151]").[36] The Coast Guard exercised that authority by establishing the demarcation lines in Part 80 of Title 33 of the Code of Federal Regulations. 33 C.F.R. § 80.01(a);[37] 2 Thomas J. Schoenbaum *Admiralty and Maritime Law* § 14-2 & n. 16 (2004) (inland rules apply to "demarcation lines set forth in regulations by the Coast Guard," citing 33 C.F.R. §§ 80.01 to 80.1705 (1986)).

■ Notably, Nantucket Sound and Jetties Beach are not listed in the geographically applicable regulation, 33 C.F.R. § 80.145 (1986) ("section 80.145"), which

Accordingly, even if defendants only referenced the COLREGS, the law dictates that they apply to the waters off the coast of Jetties Beach as explained infra.

36. As explained by the Fifth Circuit,
In most countries the International Regulations for Preventing Collisions at Sea (COLREGS) govern ship navigation in internal waters as well as on the high seas. The United States, however, has adopted a second set of navigational rules, the Uniform Inland Navigational Rules, which are in effect generally in internal waters. The Inland Rules are applicable inside certain demarcation lines set forth in regulations by the Coast Guard.
*Stolt Achievement, Ltd. v. DREDGE B.E. LINDHOLM*, 447 F.3d 360, 362 (5th Cir.2006) (internal brackets omitted).

37. In pertinent part, the foregoing regulation reads:
 § 80.01 General basis and purpose of demarcation lines.
 (a) The regulations in this part establish the lines of demarcation delineating those waters upon which mariners shall comply with the International Regulations for Preventing Collisions at Sea, 1972 (72 COLREGS) and those water [sic] upon which mariners shall comply with the Inland Navigation Rules.
 (b) The waters inside of the lines are Inland Rules waters. The waters outside the lines are COLREGS waters.
 33 C.F.R. § 80.01.

designates the demarcated areas from Race Point, Massachusetts to Watch Hill, Rhode Island.[38] Section 80.145 provides that, "Except inside lines specifically described in this section, the 72 COLREGS shall apply on the sounds, bays, harbors, and inlets along the coast of Cape Cod and the southern coasts of Massachusetts and Rhode Island from Race Point to Watch Hill." 33 C.F.R. § 80.145 (1986). Accordingly, although Congress modeled most of the INLRA on the COLREGS, *see Marine Transport Lines, Inc. v. M/V Tako Invader,* 37 F.3d 1138, 1144 (5th Cir.1994) ("Congress modeled most of the INRA on [the COLREGS]"); *Garrett v. Higgenbotham,* 800 F.2d 1537, 1538 (11th Cir.1986) ("INRA is a unified set of 38 navigational rules closely patterned after the 38 international navigational rules known as the '72 Colregs'"), Nantucket Sound and the waters off Jetties Beach where the race took place are not inland waters governed by the INLRA. The COLREGS as distinguished from the INLRA rules thus provide the governing regulations.

To cement the issue that the COLREGS apply, there was no meeting before the race during which the participants agreed to abide by an alternate set of rules. *Cf. Juno SRL v. S/V Endeavour,* 58 F.3d 1, 4–5 (1st Cir.1995) ("by entering a regatta with sailing instructions which unambiguously set forth special, binding 'rules of the road,' the participants waive conflicting COLREGS and must sail in accordance with the agreed-upon rules"). Moreover, other cases involving boat races apply the COLREGS if the races did not take place on inland waters. *See, e.g., Tunney v. McKay,* 2000 WL 33116537 (D.Conn. Nov.27, 2000).

■ Before turning to the COLREGS as a statutory source of exonerating defendants or, conversely, establishing defendants' negligence, it is important to recognize that even without a statutory violation under the COLREGS, general concepts of negligence provide an additional or supplementary means to establish a duty of care. *See Stolt Achievement, Ltd. v. DREDGE B.E. LINDHOLM,* 447 F.3d at 364 ("[e]ven without a statutory violation, liability may be imposed simply where there is negligence"). General concepts of the prudent shipmaster or the reasonably prudent skipper therefore apply. *See Id.* ("applicable standards of care in a collision case stem from the traditional concepts of prudent seamanship and reasonable care, statutory and regulatory rules," and customs); *Moore v. Matthews,* 445 F.Supp.2d 516, 522 (D.Md.2006) (noting in collision case between two pleasure boats that "[n]egligence under admiralty law is simply the failure to use reasonable care under the circumstances"); 2 Thomas J. Schoenbaum *Admiralty and Maritime Law* § 14–2 (2004) ("standard of care against which fault is determined is derived from (1) general concepts of the prudent seamanship and reasonable care" as well as "(2) statutory and regulatory rules

**38.** The demarcated areas in section 80.145 are as follows:

(b) A line drawn from Nobska Point Light to Tarpaulin Cove Light on the southeastern side of Naushon Island; thence from the southernmost tangent of Naushon Island to the easternmost extremity of Nashawena Island; thence from the southwestern most extremity of Nashawena Island to the easternmost extremity of Cuttyhunk Island; thence from the southwestern tangent of Cuttyhunk Island to the tower on Gooseber-

ry Neck charted in approximate position latitude 41°29.1' N. longitude 71°02.3' W.

(c) A line drawn from Sakonnet Breakwater Light 2 tangent to the southernmost part of Sachuest Point charted in approximate position latitude 41°28.5' N. longitude 71°14.8' W.

(d) An east-west line drawn through Beavertail Light between Brenton Point and the Boston Neck shoreline.

33 C.F.R. § 80.145.

governing the movement and management of vessels").

■■■ As masters of their respective boats, O'Siochru and Kiely had an obligation to adhere to the navigational rules of the road. *Belden v. Chase*, 150 U.S. 674, 699, 14 S.Ct. 264, 37 L.Ed. 1218 (1893) ("[m]asters are bound to obey the rules, and entitled to rely on the assumption that they will be obeyed, and should not be encouraged to treat the exceptions as subjects of solicitude, rather than the rules"); *accord Garrett v. Higgenbotham*, 800 F.2d at 1540 n. 6 (quoting *Belden*, 150 U.S. at 699, 14 S.Ct. 264). They also had a duty under general maritime negligence law to exercise the degree of care of a "reasonably prudent skipper under similar circumstances." *Naglieri v. Bay*, 93 F.Supp.2d 170, 175 (D.Conn.1999). As explained by the court in *Naglieri:*

> It is a well established principle of admiralty law that a vessel skipper or captain is ultimately responsible for the safety and welfare of his crew. The skipper has a duty to do whatever is reasonably necessary, not only to ensure the safety of his vessel and crew, but also to avoid, or at least minimize, the risk of harm to others.

*Id.* (crew member swept overboard during practice for upcoming regatta); *accord* 2 Thomas J. Schoenbaum *Admiralty and Maritime* Law § 14–2 (2004) ("test and standard for a finding of negligence is reasonable care under the circumstances, or whether judged against the standard of good and prudent seamanship, the collision could have been prevented by the exercise of due care"); *see generally Moran Tow-*

*ing Corp. v. Girasol Martima SA, Inc.,* 195 F.Supp.2d 337, 344 (D.Mass.2002) ("master has a duty to exercise 'reasonable care and maritime skill consistent with knowledge and circumstance'" in case wherein captain or master caused other vessel to run aground).

■■■ The relevant COLREGS or rules of the road applicable to the accident, as suggested by Evans and defendants, include COLREGs 12, 13, 16 and 17.[39] COLREG 12 applies to sailing vessels approaching one another and reads, in pertinent part, that:

> (a) When two sailing vessels are approaching one another, so as to involve risk of collision, one of them shall keep out of the way of the other as follows:
>
> . . . when each has the wind on a different side, the vessel which has the wind on the port side shall keep out of the way of the other . . . .
>
> (b) For the purposes of this Rule the windward side shall be deemed to be the side opposite to that which the mainsail is carried . . . .

33 U.S.C. foll. § 1602. Under this rule, O'Siochru, as the boat with the wind on the port side, had the duty to keep out of the way of Kiely's boat, which took a more direct route toward the next course buoy by sailing dead downwind. O'Siochru described the rule as set forth in maritime regulations and universally recognized.[40] To confirm the application of this rule, Kiely initiated a conversation with O'Siochru and the two agreed that Kiely's boat had the right of way and that his boat was

---

**39.** The COLREGS also contain a number of other rules that this court has considered including Rule 6, which requires vessels to proceed at a safe speed, and Rule 8, which requires that any action to avoid a collision shall be positive and made in ample time. 33 U.S.C. foll. § 1602.

**40.** The foregoing testimony appears in O'Siochru's deposition which O'Siochru, a party in the case at bar, also adopted as his testimony at trial.

the stand on boat whereas O'Siochru's boat was the give way boat.

COLREG 16, in turn, governs the give way vessel, in this instance O'Siochru's boat. The rule provides that, "Every vessel which is directed by these Rules to keep out of the way of another vessel shall, so far as possible, take early and substantial action to keep well clear." 33 U.S.C. foll. § 1602.

COLREG 17 set out the rule applicable to the stand on vessel, in this instance Kiely's boat.[41] Subpart (a) states that:

> . . . Where one of two vessels is to keep out of the way the other shall keep her course and speed.
>
> (ii) The latter vessel may however take action to avoid collision by her maneuver alone, as soon as it becomes apparent to her that the vessel required to keep out of the way is not taking appropriate action in accordance with these Rules.

33 U.S.C. foll. § 1602; *Tunney v. McKay*, 2000 WL 33116537, *5 (D.Conn. Nov.27, 2000). Subpart (b) provides that:

> When, from any cause, the vessel required to keep her course and speed finds herself so close that collision cannot be avoided by the action of the give-way vessel alone, she shall take such action as will best aid to avoid collision.

33 U.S.C. foll. § 1602; *Tunney v. McKay*, 2000 WL 33116537, *5 (D.Conn. Nov.27, 2000) (quoting Rule 17).

█ In the course of approaching the marker, as previously noted, Kiely shouted to O'Siochru that Kiely's boat had the right of way, a position fully consistent with COLREG 12. O'Siochru's boat was therefore the give way boat obligated not to impede the course of Kiely's boat and further obligated to take early and substantial action to avoid a collision pursuant to COLREG 16. Instead of taking early and substantial action to keep clear of Kiely's boat and allow sufficient sea space, O'Siochru kept within an estimated two feet and at one time came within one and one half feet of Kiely's boat. After coming in close to Kiely's boat, O'Siochru then pulled the tiller only slightly toward his body which was not enough to keep Kiely's boat at a safe distance from the port side of O'Siochru's boat. To avoid the accident, O'Siochru could have slowed the speed of his boat, stopped the race, shouted to Kiely to create more space and/or pulled the tiller closer to his body without jibing.[42] O'Siochru failed to take early or substantial action to avoid a collision.

█ Furthermore, a reasonably prudent skipper, whether captaining Kiely's boat or O'Siochru's boat, would not maintain such a close distance even under the existing circumstances of clear weather, relatively mild waters and the informal race occurring two hours before sunset. In this respect, Kiely and O'Siochru are both at fault.

█ Given the failure of O'Siochru to give way and allow sufficient sea space between the port side of O'Siochru's boat and the starboard side of Kiely's boat, it became reasonably apparent that O'Siochru would not take the appropriate action to avoid a collision. Kiely, in fact, recognized the potential risk of a collision. Kiely was therefore justified in taking "such

---

41. Although Evans does not cite the applicable COLREGS, she does argue that O'Siochru's boat was the give way vessel with the obligation to avoid the collision and Kiely's boat was the stand on vessel with the right of way. (Docket Entry # 100). Defendants likewise concur that O'Siochru's boat, with the wind on the port side, had to keep out of the way of Kiely's boat. (Docket Entry # 99, p. 26).

42. O'Siochru had sufficient experience sailing to know how far to pull the tiller without jibing.

action as will best aid to avoid collision." 33 U.S.C. foll. § 1602 (Rule 17(b)). In light of the circumstances facing Kiely at that time, such action would include staying course and creating more distance between the two boats and then jibing, reducing the speed of his boat and/or simply creating a larger space between his boat and O'Siochru's boat. Instead of taking any of these reasonable avoidance measures, Kiely shouted "jibe" and proceeded to jibe his boat which, although in a direction away from O'Siochru's boat, was made at a time when Kiely's boat was far too close to make such a jibe a reasonably prudent maneuver given the circumstances at the time including the need for relatively quick avoidance action.[43] In short, the decision to jibe was not reasonably prudent and fell short of "action as will best aid to avoid collision" within the meaning of COLREG 17.

COLREG 13, the final regulation cited by defendants, applies to sailing vessels when one vessel is overtaking another. Under this rule, the overtaking vessel is obligated to keep out of the way of the overtaken vessel. Captioned "Overtaking," the regulation reads as follows:

(a) Notwithstanding anything contained in the Rules of Part B, Sections I and II, any vessel overtaking any other shall keep out of the way of the vessel being overtaken.

(b) A vessel shall be deemed to be overtaking when coming up with another vessel from a direction more than 22.5 degrees abaft her beam, that is, in such a position with reference to the vessel she is overtaking, that at night she would be able to see only the sternlight of that vessel but neither of her sidelights.

(c) When a vessel is in any doubt as to whether she is overtaking another, she shall assume that this is the case and act accordingly. . . .

33 U.S.C. foll. § 1602; *Juno SRL v. S/V Endeavour*, 58 F.3d at 3–4 & n. 4 (quoting Rule 13).

This court finds under the facts, *see Newby v. F/V Kristen Gail*, 937 F.2d 1439, 1441 (9th Cir.1991) (whether "overtaking situation existed is a factual question"), that Kiely's boat did not approach O'Siochru's boat from a direction of more than 22.5 degrees abaft the beam of O'Siochru's boat. Kiely's boat was taking a direct route toward the course buoy during this leg of the race. O'Siochru's boat took a less direct route and engaged in a jibe halfway between the two race markers.[44] Both O'Siochru and Kiely were experienced sailors well versed in the rules of the road including, to draw a reasonable inference, the general parameters of Rule 17. They would not have designated Kiely's boat as having the right of way if she had approached O'Sciochru's boat more than 22.5 degrees abaft her beam.

 Having found that O'Siochru and Kiely violated statutory and generally imposed duties, this court turns to Evans' conduct. It is well established that substantive admiralty law allows consideration of "contributory negligence ... only in mitigation of damages." *Carey v. Bahama*

---

**43.** Kiely estimated the length of the boom as seven feet and extending approximately three feet beyond the side of the Hunter 140 when at a 45 degree angle. Kiely also estimated that the distance between the starboard side of his boat and the port side of O'Siochru's boat at the time of the jibe was two feet. Kiely also testified that he had control of the mainsail. During a jibe, the boat angles or leans thereby creating additional room to clear O'Siochru's starboard side boat. A reasonably prudent skipper would take into consideration these factors as well as the speed of the two boats and the angle of the wind during the maneuver.

**44.** O'Siochru wanted to take advantage of the apparent wind as well as the direct wind.

*Cruise Lines,* 864 F.2d 201, 207 (1st Cir. 1988) (rejecting application of Massachusetts' contributory negligence statute); *see United States v. Reliable Transfer Co., Inc.,* 421 U.S. 397, 410–411, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975) ("when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault"); *LoVuolo v. Gunning,* 925 F.2d 22, 28 (1st Cir.1991) ("proportionate fault rule [in *Reliable Transfer]* encompasses damages for personal injury and death as well as for property"). Evans, as either a passenger or a member of the crew who was not a seaman,[45] had a duty to "exercise reasonable care for [her] own safety." *Menin v. Wilner,* 424 F.2d 1058, 1059 (5th Cir.1970) (passenger in boat who stood up in front of bridge was negligent by failing to exercise reasonable care for his safety which was a concurring cause of his head injuries); *accord McKee v. Popich Bros. Water Transport Inc.,* 1994 WL 548206, \*1 (E.D.La. Oct.6, 1994) ("[a]s a passenger aboard defendant's vessel, plaintiff may not have owed a duty of care to any other party, but he still owed a duty of care to himself"). If breach of that duty was a concurring proximate cause of her injuries, then recovery may be proportionally reduced by the amount of such comparative fault. *Menin v. Wilner,* 424 F.2d at 1059 (affirming lower court's finding that the plaintiff's "negligence was a concurring proximate cause of his injury and of the damages sustained by him"); *accord*

*LoVuolo v. Gunning,* 925 F.2d 22, 28 (1st Cir.1991) ("causal relationship between the plaintiff's fault and the harm suffered is a prerequisite to apportionment of damages").

It is true that Evans adequately responded to O'Siochru's commands and controlled the jib. Shortly before and at the time of the accident, however, Evans was not paying attention to anything O'Siochru and Kiely were saying to each other. She purposefully kept herself focused on the jib to the exclusion of everything else. Meanwhile, the two boats were parallel to each other and, given the close proximity, Evans should have noticed the other boat and the need to take precautions to protect her own safety such as maintaining a close eye on Kiely's boat and lowering her body or head. She did not turn her head to look at Kiely's boat until it was too late. With her level of sailing experience and ability, Evans could have paid far more attention to the circumstances and tended the jib at the same time. By not paying attention to the circumstances, including Kiely's jibe command, Evans' conduct contributed to causing her injuries. If she had acted with reasonable care to protect her safety, she would have seen the boom and could have moved in time to avoid the boom hitting her neck. Not only was Evans negligent but such negligence contributed to causing the accident and was a proximate cause of her injuries.

The violation of the statutory regulations and general negligence principles on the part of both O'Siochru and

---

**45.** Although at one time "courts were divided over how to handle" cases in which passengers of race boats sought to have themselves classified as crew members in order to take advantage of the full panoply of seaman's remedies, the Supreme Court's refinement of the seaman status test to include an employment relationship forecloses this avenue of relief. Ronald A. Fitzgerald, *Summertime*

*Sailing: Cruise Ships, Pleasure Boats, and the Law,* 29 J. Mar. L. & Com. 267, 272–273 (1998). To provide an example, an individual who met various other sailing enthusiasts at a marina and then boarded a boat as a crew member to practice for an upcoming regatta was not a seaman at the time he was swept overboard during the practice. *Naglieri v. Bay,* 977 F.Supp. 131, 133 (D.Conn.1997).

Kiely contributed proximately to causing Evans' injuries.[46] *See generally American River Transp. Co. v. KAVO KALIAKRA SS*, 148 F.3d 446, 450 (5th Cir. 1998) ("in admiralty, the 'fault which produces liability must be a contributory and proximate cause of the collision, and not merely fault in the abstract' "). With the exception of the *Pennsylvania* rule's presumption of causation, causation under general maritime negligence law is similar to the common law which requires " 'but for' " causation coupled with "proximate or legal" causation. 1 Thomas J. Schoenbaum *Admiralty and Maritime Law* § 5–3 (2004). The fault must not only be "a but-for cause" but "the 'fault which produces liability must be a contributory and proximate cause of the collision.' " *Inter–Cities Navig. Corp. v. United States*, 608 F.2d 1079, 1081 (5th Cir.1979). In other words, "To give rise to liability, a culpable act or omission must have been 'a substantial and material factor in causing the collision.' " *Id.*

■■■■ The injuries to Evans' sense of smell and taste, as previously indicated, were proximately caused by the accident and O'Siochru and Kiely's misconduct as opposed to solely by Evans' condition of hypothyroidism. The temporal proximity of the accident to Evans' difficulty smelling and tasting food at local restaurants, which she experienced and reported to Anderson as well as to other individuals before leaving the island, evidences the requisite causal link. Evans' difficulty smelling her dog's feces ten days after the accident similarly supports the existence of the necessary causal connection. The failure to report the injury to hospital personnel during the two emergency room visits and during the third visit to obtain records does not convince this court otherwise. Evans was experiencing other injuries at that time. Her delay in reporting the injury and arranging treatment for the injury, however, evidences that the injuries did not have a major impact on her enjoyment of life.

■■■■ Where, as here, the fault on the part of O'Siochru, Kiely and Evans all contributed to proximately causing the injuries to Evans sense of smell and taste, this court turns to the task of proportionally allocating the comparative degree of their fault. *See United States v. Reliable Transfer Co., Inc.*, 421 U.S. at 410–411, 95 S.Ct. 1708; *LoVuolo v. Gunning*, 925 F.2d at 28. O'Siochru was the captain or skipper of the give way vessel. As such, he had a duty to take early and substantial action to avoid a collision. He did not take such action thereby placing Kiely in the position of taking action to avoid a potential collision. O'Siochru additionally moved into the line of Kiely's boat shortly before the accident which also contributed to the necessity for evasive action leading to the accident. Kiely then had to make a decision within a relatively short, if not exceedingly short, period of time, a cir-

---

**46.** Under the *Pennsylvania* rule, "If a plaintiff can establish both that the defendant breached a statutory duty and that the breach is relevant to the casualty in question, the defendant assumes the burden of proving that its breach could not have caused plaintiff's damages." *Pan American Grain Mfg. Co., Inc. v. Puerto Rico Ports Authority*, 295 F.3d 108, 115–116 (1st Cir.2002) (discussing *Pennsylvania v. Troop*, 86 U.S. (19 Wall.) 125, 134, 22 L.Ed. 148 (1873)). Violation of a COLREG implicates the "causation presumption under the 'Pennsylvania Rule.' " *Havinga v. Crowley Towing and Transp. Co.*, 24 F.3d 1480, 1483 n. 2 (1st Cir.1994). Assuming that the rule applies to individual defendants as opposed to only a vessel, defendants have not established that their fault could not have caused Evans' damages. In any event, irrespective of the benefit endowed under the *Pennsylvania* rule, defendants' COLREG violations were both a cause in fact and a proximate cause of the injury or damage to Evans' sense of smell and taste.

cumstance that lessens the proportionality of his fault but does not eliminate it. Finally, neither Kiely nor O'Siochru were acting prudently by racing in such close proximity with little sea water between the two boats.

 Evans' fault, however, is significant. In her own words, she was not paying attention "at all" to "the chit chatting" between O'Siochru and Kiely and she did not look at Kiely's boat when it came in the vicinity of O'Siochru's boat. Judging her credibility, her explanation that it was "really hard" to hold the jib is not believable. Her prior experience as a child sailing for six summers in sun fishes, an experience that inevitably entails controlling the single sail in a manner strikingly similar to controlling the jib in the Hunter 140. She had no difficulty handling the jib prior to the race or during the first four legs. Her credibility in other areas of her testimony was suspect particularly regarding the extent to which the injury to her sense of smell and taste has negatively affected her life.

On balance, considering the fault of each of the parties proportionately, this court finds that O'Siochru was 35% at fault, Kiely was 25% at fault and Evans was 40% at fault.

 Turning to the calculation of damages, Evans, a 39 year old woman at the time of the injury, undeniably has lost the pleasure of having a full sense of smell and taste. As stated earlier, the loss is permanent in nature and neither the type II hyposmia nor the type I hypogeusia is likely to improve during her lifetime. She has experienced emotional distress and pain and suffering proximately resulting from the loss of her full sense of smell and taste. Furthermore, the loss has affected her enjoyment of gardening, eating, particularly in restaurants, entertaining at home by cooking, whether with her sister or others, babies and men. *See generally*

*United States Steel Corporation v. Lamp,* 436 F.2d 1256, 1267 (6th Cir.1970) (loss of enjoyment of life resulting from accident compensates for inability to engage in "normal activities, social, athletic or recreational"). Having found certain areas of her testimony not credible, however, this court draws a similar inference with respect to the testimony about the degree and the extent to which the injuries have affected her enjoyment of life. *See U.S. v. Del Rosario,* 388 F.3d 1, 7 (1st Cir.2004) ("jury is free to credit or discount testimony depending upon its collective evaluation of a witness's credibility"), *vacated and remanded on other grounds,* 544 U.S. 970, 125 S.Ct. 1866, 161 L.Ed.2d 716 (2005); *see also U.S. v. Lara,* 181 F.3d 183, 204 (1st Cir.1999) (jurors "not required to discard testimony that appears to contain internal inconsistencies, but may credit some parts of a witness's testimony and disregard other potentially contradictory portions"). It is also worth noting that even though Evans was "stunned" by the information from Dr. Ackland, an orthopedic surgeon, that her sense of taste and smell were not coming back, she made no effort to confirm the off hand pronouncement by a specialist in the area of taste and smell. In fact, she did not receive treatment by any specialist until October 2004.

"[P]laintiff's verdicts in personal injury cases are not models of mathematical exactitude," *Milone v. Moceri Family, Inc.,* 847 F.2d 35, 41 (1st Cir.1988) (maritime tort suit), and it is difficult to quantify pain and suffering and the loss of enjoyment of life. *See Havinga v. Crowley Towing and Transp. Co.,* 24 F.3d 1480, 1484 (1st Cir. 1994) (characterizing "noneconomic damages, such as pain and suffering and loss of enjoyment of life" as "notoriously difficult to quantify") (admiralty action involving collision between sailboat and barge). This case is no exception. That said, this court finds that an amount of damages

totaling $150,000 adequately and fully compensates Evans for her injuries. The amount includes past damages of $20,000 from July 2002 to the time of judgment.

■ Defendants challenge an award of future damages, however, on the basis that Evans did not offer evidence of her life expectancy. The testimony regarding the permanent nature of the condition, however, supports an award of future emotional pain and suffering as well as the loss of enjoyment of life to the extent reasonably certain as opposed to speculative. *See Nettles v. Ensco Marine Company,* 980 F.Supp. 848, 851–854 (E.D.La.1997) (medical testimony of recurrent herniated disk caused by accident and permanent restrictions on bending and lifting sufficient to support future pain and suffering award in allision action applying substantive general maritime law); *see also Tolar v. Kinsman Marine Transit Company,* 618 F.2d 1193, 1197 (6th Cir.1980) (medical testimony of permanent disability sufficient to support award of future lost earnings in Jones Act case); *Rogers v. Elgin, Joliet & Eastern Railway Company,* 248 F.2d 710, 712 (7th Cir.1957) (medical testimony of permanent limitation of motion and the plaintiff's testimony of pain sufficient to support future pain and suffering instruction in FELA case).

■ As a final matter, defendants seek a bar upon an award of prejudgment interest because of the delay of the trial caused by the activities and substitution of Evans' counsel. Evans fails to respond or address the issue other than summarily asking for "interest." [47]

■ As a general rule in maritime collision cases, "prejudgment interest should be awarded ..., subject to a limited exception for 'peculiar' or 'exceptional' circumstances." *City of Milwaukee v. Cement Div., Nat. Gypsum Co.,* 515 U.S. 189, 195, 115 S.Ct. 2091, 132 L.Ed.2d 148 (1995); *accord Borges v. Our Lady of the Sea Corp.,* 935 F.2d 436, 444 (1st Cir.1991) ("prejudgment interest on past pain and suffering is within the discretion of the trial court"). Awarding prejudgment interest ensures full compensation for the loss which constitutes a "basic principle of admiralty law." *City of Milwaukee v. Cement Div., Nat. Gypsum Co.,* 515 U.S. at 195–196, 115 S.Ct. 2091. Undue delay in prosecuting an action may nonetheless serve as a basis to deny prejudgment interest. *Id.* at 196, 115 S.Ct. 2091 ("the most obvious example" to justify denying prejudgment interest is "the plaintiff's responsibility for 'undue delay in prosecuting the lawsuit' ").

This court is not persuaded by defendants' argument that the activities and substitution of Evans' trial counsel warrants a denial of prejudgment interest. Although the activities engendered a delay, it did not span an extended period of time. In the fall of 2005, defendants requested a close of discovery in March 2005 whereas Evans wished to proceed to trial. (Docket Entry ## 27 & 30). In May 2006, this court extended discovery but only until September 30, 2006, and only partly due to the need for new counsel to acquaint himself with the case.

■ With respect to the interest rate, the rate in the forum state provides one source for setting the prejudgment interest rate. *Randolph v. Laeisz,* 896 F.2d 964, 969 (5th Cir.1990) (approving trial court's discretion to award "prejudgment interest rate of the state in which the court sits"); *Marine Overseas Services, Inc. v. Crossocean Shipping Co., Inc.,* 791 F.2d

47. The proposed findings ask for an award of "$2.5 million plus interest and costs." (Docket Entry # 100). The amended complaint seeks "money damages" for the "injuries suffered by plaintiff and the cost of suit." (Docket Entry # 31).

1227, 1236 (5th Cir.1986) (admiralty courts setting prejudgment interest rates have "broad discretion and may look to state law or other reasonable guideposts indicating a fair level of compensation"); *United States v. M/V Zoe Colocotroni*, 602 F.2d 12, 14 (1st Cir.1979). Utilizing a prime rate average is also reasonable, *Pimentel v. Jacobsen Fishing Co., Inc.*, 102 F.3d 638, 640 (1st Cir.1996); *see Cement Div., Nat. Gypsum Co. v. City of Milwaukee*, 31 F.3d 581, 587 (7th Cir.1994) ("best starting point is to award interest at the market rate, which means an average of the prime rate for the years in question"); *BP Exploration & Oil, Inc. v. Moran Mid–Atlantic Corp.*, 147 F.Supp.2d 333, 347 (D.N.J. 2001), although neither party suggests what that average might be or provides evidence to support such a methodology.

Massachusetts applies a 12% per annum rate of prejudgment interest in tort actions. Mass. Gen. L. ch. 231, § 6B. Adhering to this same rate, this court will award prejudgment interest on the $20,000 amount calculated at 12% per annum thereby yielding an annual amount of $2,400 or $14,400 for a six year period and a daily amount of $6.58. Prejudgment interest from the July 5, 2002 accident to the final judgment therefore totals $15,111.[48]

### CONCLUSION

For the foregoing reasons, this court finds in favor of Evans on the negligence claim in the amount of $90,000 or 60% of the $150,000 total. This court also awards Evans prejudgment interest from July 5, 2002 to the date of judgment at the rate of 12% per annum which yields an award of $15,111.

---

**48.** The figure is rounded to the nearest dollar.